**Fred V. CHERRY**

v.

**The UNITED STATES.**

**No. 73–77.**

United States Court of Claims.

Nov. 19, 1980.

Kaletah N. Carroll, Fairfax, Va., attorney of record, for plaintiff.

Frances L. Nunn, Washington, D. C., with whom was Asst. Atty. Gen., Alice Daniel, Washington, D. C., for defendant; Major Francis S. Moran, Jr., Washington, D. C., of counsel.

Before FRIEDMAN, Chief Judge, NICHOLS and BENNETT, Judges.

## ON DEFENDANT'S MOTION FOR RELIEF FROM JUDGMENT

NICHOLS, Judge:

This military pay case is before the court on defendant's motion for relief from judgment of February 21, 1979, pursuant to Rule 152(b)(6).

In our February 1979 judgment, 219 Ct.Cl. ——, 594 F.2d 795, this court found the following to be the undisputed facts of this case concerning the Air Force's disposition of the military pay and allowances of Colonel Fred Cherry.

On October 22, 1965, Colonel Cherry was shot down while flying a combat mission over North Vietnam. The Air Force was aware that Cherry was or might be alive, but communication with him was not possible. Cherry remained a prisoner of war until February 12, 1973. Prisoners of war are entitled to regular pay and promotion, and during his period of imprisonment, Colonel Cherry earned $147,184.35 before

taxes in basic pay and allowances. Such payments were kept in an account for him by the Air Force.

The Air Force disbursed to his then spouse, Shirley Ann Cherry (hereinafter wife), a/k/a Shirley Ann Brown Cherry Saunders, payments from this account for her support and for the support of their four children, to an extent that virtually depleted the account. Such payments were made pursuant to the Missing Persons Act, 37 U.S.C. §§ 551–558.

The record indicated that Mrs. Cherry was not faithful to her husband while he was overseas, in that she had a child by another man while being supported by Colonel Cherry's military pay. After his return, Colonel Cherry divorced his wife on the grounds of adultery. Colonel Cherry alleged that Mrs. Cherry was extravagant with his money and dissipated it without let or hindrance by the Air Force.

Plaintiff Cherry claimed entitlement to funds transferred from his pay account on two theories. The first theory was that the Missing Persons Act is unconstitutional as it allowed confiscation of his property without due process of law or procedural safeguards. In the alternative, plaintiff argued that payments to his wife were made illegally since the Air Force arbitrarily and capriciously failed to provide and follow adequate safeguards to insure that his interests, as well as those of his dependents, were being protected.

We found that the Missing Persons Act is constitutional. The discretion given to the Secretary or his designee by the Act is by necessity extensive and flexible yet constitutionally acceptable since dependents must be provided for under varied and changing circumstances caused by forced and prolonged separations. We further found that although the statute does not use the word "trustee," the armed services have accepted a role not practically distinguishable from that of a trustee for their missing servicemen, and that the Air Force in this case had not properly performed its trustee duties and was therefore liable to the plaintiff in some amount. To support our finding that the Air Force had a fiduciary relationship with plaintiff Cherry, we cited and followed our earlier decision in *Mitchell v. United States*, 219 Ct.Cl. ——, 591 F.2d 1300 (1979). However, this case has since been reversed by the United States Supreme Court in *United States v. Mitchell*, 445 U.S. 535, 100 S.Ct. 1349, 63 L.Ed.2d 607 (1980). In *Mitchell*, this court noted that a fiduciary relationship between the United States and the Quinault Indian Tribe was expressly declared by statute in the General Allotment Act, 25 U.S.C. § 348, and therefore we determined that the tribe could recover compensation for breaches of that trust. The Supreme Court reversed our decision and held that the General Allotment Act created only a limited trust relationship between the United States and the allottee and that the government had no duty under that Act to manage timber resources for the benefit of the Indian allottees.

Defendant's motion is on the ground that we relied on a precedent now reversed and therefore our decision is discredited. The Supreme Court did not address the proposition in *Mitchell* we relied on here, but we are of the view that Colonel Cherry's rights do not depend on a trust analysis and for certainty we should state them in different and less controversial terms. In response to defendant's motion, we withdraw our former opinion in this case. Furthermore, we substitute in its place the following.

I

Plaintiff has properly founded his claim to entitlement to military pay and allowances which accrued while he was a prisoner of war of the North Vietnamese from October 22, 1965, to February 12, 1973, pursuant to 37 U.S.C. §§ 551–558, The Missing Persons Act.

██ The Missing Persons Act is a constitutional exercise of Congress' power "to make Rules for the Government and Regulation of the land and naval Forces." U.S. Const. art. I, § 8, cl. 14. The Act is one of many laws that effectuate the duty noted by Abraham Lincoln "to care for him who

shall have borne the battle and for his widow, and his orphan." Abraham Lincoln, Second Inaugural Address (March 4, 1865).

The Act authorizes continuation of pay and allowances to members of the armed forces missing in action, 37 U.S.C. § 552, and allows the respective Armed Services' Secretaries or their designee to initiate, discontinue, or alter pay allotments authorized in advance by the serviceman for his dependents "when he considers it in the interest of the member, his dependents, or the United States * * *." 37 U.S.C. § 553(e).

■ The law has long been that servicemen remain entitled to their pay while prisoners of war or in a MIA status. *Bell v. United States,* 366 U.S. 393, 81 S.Ct. 1230, 6 L.Ed. 365 (1961). To tamper with this right by legislation, especially with respect to pay already accrued, would raise serious fifth amendment issues, as it might be held to constitute a taking. *Lynch v. United States,* 292 U.S. 571, 54 S.Ct. 641 (1934). To authorize the executive to tamper at its option would likewise raise questions, unless the tampering was reasonably necessary and to be conducted with respect for the serviceman's interests. If the Act is not interpreted to retain in the MIA serviceman a claim to all his unallotted pay that accrues during his enemy confinement, less proper reallotments only, our jurisdiction would be questionable under the standards of *United States v. Testan,* 424 U.S. 392, 96 S.Ct. 948, 47 L.Ed.2d 114 (1976), but in that event, under the analysis used in *Regional Rail Reorganization Act Cases,* 419 U.S. 102, 125, 95 S.Ct. 335, 349, 42 L.Ed.2d 320 (1974), constitutionality of the Missing Persons Act would be dubious indeed, and it should be construed to avoid such doubts. Certainly, this Act is intended to and does grant a great deal of discretion to the Secretary or his designee. But such discretion is constitutionally acceptable, especially in light of the legislative history of the Missing Persons Act and its predecessors.

In 1942, the Committee on Naval Affairs supported the predecessor of the present Act (50 U.S.C. App. § 1001) because it recognized that hardships occurred when missing servicemen had neglected to provide for their dependents via the allotment procedure established by the military. H.R.Rep. No.1680, 77th Cong., 2d Sess. 3, *reprinted in* [1942] U.S.Code Cong.Service 278–79; *Bell v. United States, supra.* And the present § 553(e), allowing the Secretary's (Air Force) alteration of allotments, was passed at a time when Congress often expressed concern for dependents of prisoners of war in North Vietnam who could not obtain necessary financial support due to bureaucratic red tape. 112 Cong.Rec. 20697, 20919, 21672 (1966) (all discussing problems faced by such dependents).

■ Thus, it is clear that Congress desired and needed a flexible system to allow provision for dependents whose supporting members were separated from their families not only geographically, but from any communication that would enable participation in the disbursement of their pay. Administrative discretion is needed to adjust to changing circumstances which are bound to occur over such a forced separation of many years. Concern for a family that might be in the deplorable shape of Colonel Cherry's did not require Congress to leave unprovided for the larger number, as one hopes, of families whose missing husbands would have bitterly resented red tape or obstruction interposed between their pay accounts and the dependents with need for support and care.

■ Yet the Secretary is not absolute in his discretion. He must make changes in the allotment of pay and allowances in the interest of "the member, his dependents, or the United States." 37 U.S.C. § 553(e). Such standards are specific enough to pass muster as a valid delegation of power by Congress, since the policy aim desired by Congress and the means to achieve these objectives have been clearly disclosed to the Armed Services in legislative debates concerning the Act and its predecessors, and in the language and standards of the Act itself. *Compare Lichter v. United States,* 334 U.S. 742, 783–86, 68 S.Ct. 1294, 1315–1317, 92 L.Ed. 1694 (1948); *American Power and Light Co. v. SEC,* 329 U.S. 90, 105, 67 S.Ct.

133, 91 L.Ed. 103 (1946); *Grymes Hill Manor Estates v. United States*, 179 Ct.Cl. 466, 469–72, 373 F.2d 920, 922–23 (1967). For present purposes it suffices to note that the member's interests are of equal status with those of his dependents.

■ We also reject plaintiff's arguments that the Act violates due process and denies notice and an opportunity to be heard. Plaintiff argues that a guardian ad litem should have been appointed to represent him, who could have received notice of any intended changes in his allotments. Clearly to do this would have much better respected the equality of treatment of servicemen, and dependents, as the statute implicitly requires, but we do not hold it is constitutionally necessary. The Act anticipates that the branch of the armed forces to which the serviceman belongs will scrutinize changes in his designated allotments to determine that any changes are warranted by the circumstances or essential for the well-being of his dependents. 37 U.S.C. § 553(b) and (h).

■ The main reason why we think the statute is constitutional is because in reading § 553(e) we find it implicit that Congress intended that the Secretary should exercise his/her discretion fairly and carefully. There is a general substantial requirement that, to be valid, an administrative determination must not be made arbitrarily. 2 Vom Baur, *Federal Administrative Law*, § 597 (1942). As Mr. Justice Sutherland explained in *Jones v. Securities & Exchange Commission*, 298 U.S. 1, 24–25, 56 S.Ct. 654, 80 L.Ed. 1015 (1936)—

Arbitrary power and the rule of the Constitution cannot both exist. They are antagonistic and incompatible forces; and one or the other must of necessity perish whenever they are brought into conflict. * * * To escape assumptions of such power on the part of the three primary departments of the government, is not enough. Our institutions must be kept free from the appropriation of unauthorized power by lesser agencies as well. And if the various administrative bureaus and commissions, necessarily called and being called into existence by the increasing complexities of our modern business and political affairs, are permitted gradually to extend their powers by encroachments—even petty encroachments—upon the fundamental rights, privileges and immunities of the people, we shall in the end, while avoiding the fatal consequences of a supreme autocracy, become submerged by a multitude of minor invasions of personal rights, less destructive but no less violative of constitutional guaranties.

## II

■ Defendant argues in the motion now before the court that the Missing Persons Act does not expressly impose a trust duty upon the United States to administer the accounts of missing persons, and consequently none may be implied. We do not find it necessary that we determine whether the Act creates any trust duty at all. In the previous opinion we approached the Air Force's statutory responsibility to administer Colonel Cherry's pay and allowances by characterizing that responsibility as a fiduciary duty. However it is not necessary that the Secretary assume the role of trustee in order to exercise the statutory duties in a manner that is constitutionally sufficient. As we explained above, all that is required of him is that he exercise the statutorily granted discretion fairly, without abusing it. Regarding the disbursement of Colonel Cherry's pay and allowances, the Secretary of the Air Force abused that discretion.

When the Air Force was called upon to make changes in the allotment of Colonel Cherry's pay, the Secretary was obliged to consider the interests of both the member and his dependents. However, this was not done. The Air Force arbitrarily and capriciously settled on a policy of satisfying the more vocal demands of dependents as painlessly as possible for it and for the dependents, without consideration of the concerns of the absent and silenced serviceman. This was especially clear in Colonel Cherry's case. Letters from Mrs. Cherry requesting

emergency funds were routinely granted for a variety of reasons: vacations, large amounts of cash stolen. All she had to do was to state her wants in writing. Such requests were granted despite the depletion of Colonel Cherry's savings, and despite the Air Force's policy of allocating 10 percent of a member's pay to savings, absent *emergencies.* Indeed, the record does not show a single instance in which the Air Force rejected a request for funds by the wife, no matter what reasons she assigned.

It is understandable and fitting given the policies of the Act that the Air Force did not demand that dependents prove "beyond a reasonable doubt" their entitlement to emergency funds or additional allotments. The Air Force was attempting to alleviate any financial worries encountered by servicemen's dependents at what was a very distressful period for those persons. But the Air Force had a duty to the serviceman also. Surely the Air Force was aware that not all dependents can wisely budget and utilize the pay allocated them, especially if the missing serviceman ordinarily had handled family financial matters. And certainly the Air Force was aware that not all servicemen's wives remain loyal to their missing spouses during the long separations encountered in these circumstances. Indeed, the fact that the Air Force does discontinue allotments in the event of proved marital misconduct demonstrates this awareness.

It is clear that at some point during Colonel Cherry's absence the Air Force did have a suspicion that Mrs. Cherry could be using the allotment given her unwisely, or even abusing her privileges. The Air Force claims it resisted investigating her marital misconduct despite a complaint and letter from Colonel Cherry's sister in 1972 because regulations forbade any investigation of marital misconduct until a written complaint was filed against the dependent, with documentary substantiation. The intent of the regulation is understandable: to prevent unfounded gossip from placing a dependent and her family in constant scrutiny. But it places too great a burden on the absent serviceman to use such a require-

ment as an excuse to avoid inquiry, when other circumstances point to the possibility that a spouse may be spending her allotments in ways that are inconsistent with the objectives of the Missing Persons Act. After all, the Air Force is required to protect Colonel Cherry's pecuniary interests while he is absent. It is not required to police the fidelity of his wife, but it is to disburse his pay account with some regard to what his wishes would probably be, were he in a position to state them.

We certainly would not demand a full scale investigation of the activities of every serviceman's spouse while he was missing in action, nor a proliferation of forms and proofs whenever an emergency request for funds is made by a serviceman's dependent, but we do find that in this case, the Air Force became at some point overeager to care for Mrs. Cherry's every want, and to protect her privacy, to the enormous disadvantage of Colonel Cherry, and in disregard of his claim to equal consideration of his pecuniary interests. For example, in January 1970, Mrs. Cherry requested, and received, emergency funds from the pay account for surgery in a private hospital, despite the fact that as a serviceman's wife she was entitled to free medical care at excellent military hospitals in the area. A proper custodian of Colonel Cherry's funds would not have casually accepted her explanation that "I was a little afraid," for such a costly expenditure. The record indicates that the operation in the private hospital was for delivery of an illegitimate child; had the Air Force merely inquired as to the nature of the surgery, it might have discovered this evidence of marital misconduct. Also, it was clear that in late 1971 Mrs. Cherry was avoiding the inquiries of the Air Force, which by this time had become concerned about her frequent and expensive emergency requests, yet despite this evident avoidance, payments continued.

The court in reaching this decision does not presume or endeavor to substitute its own judgment for that of the Secretary. But after a careful examination of the record we are convinced that the Secretary

acted arbitrarily in granting each and every request for funds made by Mrs. Cherry. Colonel Cherry has suffered a legally cognizable injury, and the quantum of damages remains for future ascertainment. This court will not overturn an administrative decision of the military without an adequate showing on the record as a whole that an abuse of discretion has been committed. *DeBow v. United States*, 193 Ct.Cl. 499, 504, 434 F.2d 1333, 1335–36 (1970), *cert. denied*, 404 U.S. 846, 92 S.Ct. 150, 30 L.Ed.2d 84 (1971); *Borys v. United States*, 201 Ct.Cl. 597, 609, *cert. denied*, 414 U.S. 1001, 94 S.Ct. 355, 38 L.Ed.2d 237 (1973); and *Robinson v. United States*, 217 Ct.Cl. —— (1978). Indeed, in certain matters such as promotions, which depend on the particular needs and circumstances of the service, this court normally has neither the power to alter the discretionary decision of the military nor the authority to promote an officer. In such instances judicial intervention is wholly inappropriate and this court has so held. *Muldonian v. United States*, 193 Ct.Cl. 99, 432 F.2d 443 (1970); *Cooper v. United States*, 203 Ct.Cl. 300 (1973); and *Abruzzo v. United States*, 206 Ct.Cl. 731, 513 F.2d 608 (1975). However, while there is no right to a military promotion (*see Muldonian* at 107, 432 F.2d at 446–47), there is a right to military pay. *Bell v. United States, supra*; 37 U.S.C. §§ 204–205. And in this case Colonel Cherry has shown that his right to pay and allowances was violated by the Secretary.

Therefore, we hold that at some point in time the Air Force should have undertaken an investigation of the manner in which funds were expended and that Colonel Cherry is entitled to funds disbursed after that point, if further examination of the facts indicates that disbursements to Mrs. Cherry were made on the basis of false claims by her or were for nonemergency purposes or not warranted by the particular circumstances. Possibly the Air Force would have learned thus of earlier misstatements and been able to offset claims by it for refunds against current allotments.

Also, the Air Force has established some regulations for the administration of miss-

ing servicemen's pay accounts, and it may appear that these regulations have been violated in this case. We are informed by counsel for plaintiff that certain Air Force regulations exclude so-called "special pay" and flight hazard pay from allotments to dependents, but counsel fails to provide us with a text of that regulation, as required by Court of Claims Rule 124. In addition, there is a discrepancy in the record as to the percentage of his pay Colonel Cherry claims to have allotted to his wife. Colonel Cherry contends that the Air Force relied on a "Record of Emergency Data" that was not signed by him and that contained an alteration of the initial allocation he made to his wife in 1964. The form relied on by the Air Force, he argues, was typed and signed on October 25, 1965, three days after he was shot down. Whether the Air Force did violate its own regulations and thereby erroneously authorized payments to Mrs. Cherry also must be determined by the trial division.

Accordingly, defendant's motion for relief from our prior judgment in this matter is denied, but we substitute in place of our former opinion, the opinion rendered herein. Also, defendant's motion for reconsideration en banc of this matter is denied as a majority of this court has not voted to conduct such a rehearing. The cause is remanded to the trial division for further proceedings under Rule 131(c) for a determination of the amount of recovery due plaintiff.

BENNETT, Judge, dissenting:

I respectfully dissent. The court now vacates its prior opinion which was based on a breach of trust theory. As pointed out in my dissent to the opinion of February 21, 1979, 219 Ct.Cl. ——, 594 F.2d 795 (1979), there was no express or implied trust to breach and the authority relied upon by the court was, in any event, not in point. The Supreme Court subsequently invalidated that authority. Now the court reaches the same result it did earlier by simply concluding that the Secretary of the Air Force abused his discretion in implementing the

Missing Persons Act in plaintiff's case. Indeed, he did abuse his discretion in a most deplorable way, to plaintiff's great disadvantage. The character of his abuse was gross negligence, as the court well points out, in failing to evaluate the demands of plaintiff's faithless wife for access to his accumulating pay and allowances while he was a prisoner of war. Negligence, of course, is a tort. This court has no tort jurisdiction. The statute, 28 U.S.C. § 1491 (1976), makes this explicit, as does a long unbroken line of our decisions. Torts, where the United States Government is concerned, are governed by the terms of the Tort Claims Act which defines the circumstances under which tort claims can and cannot be properly asserted against the Government. For instance, 28 U.S.C. § 2680 (1976) prohibits certain claims:

(a) Any claim based upon an act or omission of an employee of the Government, exercising due care, in the execution of a statute or regulation, whether or not such statute or regulation be valid, or based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused.

\* \* \* \* \* \*

(j) Any claim arising out of the combatant activities of the military or naval forces, or the Coast Guard, during time of war.

(k) Any claim arising in a foreign country.

It is clear from the foregoing that plaintiff cannot recover in a federal court on the claim he has presented. Certainly he is not entitled to recover in this court. "Congress has always withheld from this court and from the Tucker Act original jurisdiction over tort claims against the Government." *Eastport S.S. Corp. v. United States*, 178 Ct.Cl. 599, 609, 372 F.2d 1002, 1010 (1967). In *United States v. Neustadt*, 366 U.S. 696, 705, 81 S.Ct. 1294, 1299, 6 L.Ed.2d 614 (1961), the Supreme Court reversed the United States Court of Appeals for the Fourth Circuit which had ruled that "if the government assumes a duty and negligently performs it, a party injured thereby may recover damages from the United States." 281 F.2d 596, 599 (4th Cir. 1960). The Government's offense in that case was one of negligent misrepresentation in the making of a careless real estate appraisal. *See also Palcic v. United States*, 590 F.2d 344 (1979). The law of the land was succinctly stated in *Feres v. United States*, 340 U.S. 135, 141, 71 S.Ct. 153, 157, 95 L.Ed. 152 (1950), when the Supreme Court said: "We know of no American law which ever has permitted a soldier to recover for negligence, against either his superior officers or the Government he is serving."

Nowhere in the cases, in the statutes, or in Air Force regulations has the court identified any authority to surmount the obstacles created by the statutes quoted above explicitly barring tort claims against the Government by members of the military service. If plaintiff has any remedy it would properly be to seek from Congress a private relief bill or a congressional reference under 28 U.S.C. § 2509 (1976). Congress could have created a money liability arising from abuse of the Secretary's discretion, but it chose not to do so. Without such a command there is no entitlement which can be addressed by this court. This is a fatal weakness in plaintiff's claim. Nowhere does a statute or regulation expressly or by implication establish a right that plaintiff be paid anything arising from such circumstances as these. On the contrary, as we have seen, the Tort Claims Act flatly bars claims arising from the discretionary function "whether or not the discretion involved be abused." An additional bar applies expressly to claims arising from military activity. Plaintiff has not stated a claim on which the court can grant relief. Nor do we have jurisdiction of such a claim. The only suits where we have jurisdiction to grant a money judgment are those in which plaintiff has paid money over to the Government, directly or in effect, and seeks return of all or part thereof, or where he alleges that the particular provision of law

relied upon grants him, expressly or by implication, a right to be paid a certain sum. Here the express direction of the law bars the claim. *United States v. Testan*, 424 U.S. 392, 96 S.Ct. 948, 47 L.Ed.2d 114 (1976); *Austin v. United States*, 206 Ct.Cl. 719, *cert. denied*, 423 U.S. 911, 96 S.Ct. 215, 46 L.Ed.2d 140 (1975); *Eastport S.S. Corp. v. United States, supra.*

Alternatively, if the abuse of discretion which the majority relies upon does not amount to negligence, then the plaintiff has still failed to state a claim upon which relief can be granted. There is simply no judicially enforceable obligation to the plaintiff which has been breached.

The majority appears to rely heavily upon the Air Force policy of "discontinu[ing] allotments in the event of proved marital misconduct," but such a policy does not create an obligation which can be enforced by plaintiff. In any event, the Air Force policy (in the majority's own words) required "a written complaint * * * against the dependent, with documentary substantiation." Institution of such a policy was a legitimate exercise of the Secretary's discretion, and protects the privacy interests of the dependents by limiting Government intervention into their private lives. Therefore, that policy provides no support for the majority's position because the facts of this case are outside the scope of that legitimate policy.

The Missing Persons Act did not provide solely for the protection of the plaintiff's interests. Rather, the Act provides for discretionary disbursements by the Secretary "when he considers it in the interest of the member, his dependents or the United States." 37 U.S.C. § 553(e) (1976). There can be no doubt that allotments to the plaintiff's children were in the interest of the plaintiff, his children and the United States. The care and maintenance of those children no doubt required the supervision of the children by their mother (even if she was an unfaithful wife), and in order to insure such supervision an additional allotment to the wife may have been required.

While the Secretary may have abused his discretion in a most deplorable way in failing to remain conscious of his obligation to protect the interests of the plaintiff, it is not clear that he committed a wrong to plaintiff for which we can grant relief. It would be inappropriate and unjustified for this court to second-guess the Secretary in this case. The remand proposed by the majority will require this court to second-guess the Secretary's discretionary determination of what portion of plaintiff's salary was necessary to support his four children. Such a determination is not subject to measurement against any statutory or regulatory standard. On the facts of this case, plaintiff simply does not have a judicial remedy.

If the plaintiff cannot recover for negligent performance of a discretionary function on the part of the Government, *United States v. Neustadt, supra*, it makes no sense to allow that plaintiff to recover when the action is classified as less than negligence, *i. e.*, simply an abuse of discretion. Plaintiff cannot recover any portion of his salary which the Government, in the exercise of its discretion and on the authority of the Missing Persons Act, paid to his dependents.

The circumstances of Colonel Cherry's case present a poignant appeal for judicial activism such as the court exhibits here. But, there is just not a judicial remedy for each and every wrong that takes place in our society. When there are wrongs that should have remedies, they are sometimes, as here, matters for legislative discretion. This is particularly true where Congress has by public law withheld a legal basis for recovery and has, moreover, limited the jurisdiction of this court to handle particular types of cases. Wrongs without judicial remedy are ghosts in the law which the court now would slay with weapons not given to it but belonging to others vested with the exercise of political judgments.