Jennie B. FORS, as Personal
Representative of the Estate
of Gary Henry Fors

v.

The UNITED STATES.

No. 638–85C.

United States Claims Court.

April 28, 1988.

Hollis H. Barnett, Puyallup, Wash., for plaintiff.

Eric L. Miller, Washington, D.C., with whom was Asst. Atty. Gen. John R. Bolton, for defendant. Captain Michael P. McCloskey, USMC, Office of the Judge Advocate General, Dept. of the Navy, of counsel.

## OPINION

MARGOLIS, Judge.

In this military pay case, plaintiff, Jennie B. Fors, seeks interest from the defendant United States, in the amount of $203,690.09 on her son's accumulated military pay and allowances for the period from 90 days after he was declared dead until the funds were paid to the plaintiff over four years later. The parties earlier filed cross motions for summary judgment. The court denied these motions, concluding that disputed issues of material fact existed. *See Fors v. United States*, No. 638–85C (Cl.Ct. May 5, 1987). Trial was held on January 7, 1988, in Washington, D.C. After full consideration of the trial record and oral argument, the court finds for the defendant.[*]

## FACTS

In 1967, Capt. Gary H. Fors was a United States Marine Corps pilot stationed in Vietnam. On December 22, 1967, Capt. Fors was on a classified strike mission pi-loting an F–4B aircraft across the border into Laos. After enemy fire struck Capt. Fors' aircraft, Capt. Fors and his Radar Intercept Officer were forced to eject from the aircraft.

Search and rescue teams were promptly notified and arrived at the scene of the crash within minutes. A rescue helicopter was able to locate and rescue the Radar Intercept Officer. The search continued for Capt. Fors, but due to heavy enemy fire, the rescuers were unable to locate Capt. Fors prior to darkness. Rescue operations resumed the next day and continued until December 29, 1967 with no results. In February 1968, Capt. Fors was classified as missing in action (MIA).

Pursuant to the Missing Persons Act, 37 U.S.C. §§ 551–558, Capt. Fors continued to receive all military pay and allowances. As he had no dependants, Capt. Fors' monthly payments were deposited into an interest-bearing account under the Uniformed Services Savings Deposit Program (USSDP), which was established for missing service-members pursuant to 10 U.S.C. § 1035. Section 1035 authorized the payment of interest on USSDP funds, terminating 90 days after the servicemember's return to the United States, at the rate of 10% per annum, compunded quarterly.

During Capt. Fors' classification as MIA, he received regular promotions and was eventually promoted to the rank of Lieutenant Colonel. Lt. Col. Fors' parents maintained hope that their son was still alive and encouraged the United States government to search for MIAs in Laos. The Fors became active in the National League of Families of American Prisoners and Missing in Southeast Asia, an organization composed of the families of ser-vicemembers missing in action in Southeast Asia. The group was organized for the purpose of communicating with the federal government concerning efforts to locate servicemembers listed as missing in action.

After the formal cessation of hostilities with North Vietnam, and after the return

---

[*] At the trial, the court admitted into evidence plaintiff's exhibits 1–46 and defendant's exhibits 1–24. Five depositions also were admitted into evidence. Paragraphs 11, 12, 15 and 16 of Major Allord's affidavit (defendant's exhibit 22) are deemed inadmissible.

of prisoners held by North Vietnam, Henry Fors, Lt. Col. Fors' father, believed that the United States government was no longer making any real effort to learn what had happened to the servicemembers still missing in Southeast Asia. In unsuccessful efforts to ascertain the whereabouts of his son, Mr. Fors traveled both to Moscow and to the Paris Peace Talks to meet with the North Vietnamese. Mr. Fors also helped to organize and sponsor a group that traveled through Southeast Asia in an unsuccessful search for servicemembers missing in action.

In 1978, the Fors received notice that the Marine Corps Missing and Captured Review Board was going to review their son's MIA status to determine whether it should be changed to killed in action (KIA). On July 31, 1979, the Review Board held a hearing, at which the Fors were present, to review all evidence and to present additional evidence. Over the opposition of Lt. Col. Fors' parents, the Board recommended that Lt. Col. Fors' status be changed to KIA.

At the direction of the Commandant of the Marine Corps, on August 7, 1980, the designated reviewing officer, Lt. Col. J. Hammond, made a presumptive finding of death for Lt. Col. Fors. Remarks made on Form DD1300, the military equivalent of a death certificate, indicate:

> The exact time and place of Lt Col Fors' death are not known.... On the basis of the foregoing, the absence of information from all sources that he survived, and the elapse of time without indication of survival, it was determined that Lt Col Fors is dead. This finding of death was made by me as designee of the Secretary of the Navy under Title 37, U.S.Code Sections 555 and 556 on 7 August 1980. Accordingly, continuance of Marine Corps pay and allowances under Chapter 10, Title 37, U.S.Code, terminates on that date.

On August 7, 1980, then Capt. Larry A. Johnson, the Marine Corps officer charged with notifying Lt. Col. Fors' family of the change of status, contacted Henry Fors and arranged to meet with him on August 8, 1980. At that meeting, Capt. Johnson

notified Mr. Fors that a presumptive finding of death had been made on August 7, 1980 and explained what benefits were available to Lt. Col. Fors' family. Capt. Johnson said that he would contact Mr. Fors within the next few weeks so that a meeting could be arranged to deliver a casualty assistance package. The casualty assistance package included a number of forms that the family was required to fill out in order to receive the servicemember's accumulated back pay and benefits.

On or about August 27, 1980, Capt. Johnson telephoned Henry Fors' office to arrange a meeting to deliver the casualty assistance package. Henry Fors was not in the office, and Capt. Johnson was informed that due to an emergency, Mr. Fors would be unavailable for approximately three weeks. On two other occasions between August 27, 1980 and September 15, 1980, Capt. Johnson unsuccessfully attempted to contact Mr. Fors.

In late August and early September of 1980, Henry Fors suffered from a number of strokes. During this period, Henry Fors was either in the hospital or at his beach house, which was about an hour and one-half drive from his office. Also in early September 1980, Mr. Fors, in his capacity as guardian of Lt. Col. Fors, filed an application for correction of the presumptive finding of death before the Board for Correction of Naval Records. At the same time, in a second effort to regain his son's MIA status, Mr. Fors also filed a lawsuit in the U.S. District Court for the Western District of Washington challenging the presumptive finding of death.

On September 11, 1980, Capt. Johnson learned of the lawsuit through an article in the *Tacoma News Tribune*. On September 15, 1980, after his third unsuccessful attempt to contact Henry Fors, Capt. Johnson wrote to his superior, Major Gary Allord, advising him that Mr. Fors was challenging the presumptive finding of death. Capt. Johnson's impression was that in light of the unsuccessful attempts to contact Mr. Fors and in view of the pending litigation, all attempts to deliver the casualty assistance package should be temporari-

ly halted. Capt. Johnson requested guidance on this matter as soon as possible.

On November 15, 1980, Henry Fors died. Shortly thereafter, Capt. Johnson learned of Henry Fors' death and notified Major Allord of the death. In a November 18, 1980 letter, Major Allord advised Capt. Johnson that all attempts to deliver the casualty assistance package "be held in abeyance pending further disposition instructions from this Headquarters." Major Allord indicated that Capt. Johnson's request for guidance on September 15, 1980 was not acted upon earlier at the direction of the Marine Corps Judge Advocate Division "pending dissolution of litigation and Mr. Henry Fors' appeal to the Bureau [sic] for the Correction of Naval Records."

Lt. Col. Fors' mother, Jennie B. Fors, the plaintiff in this case, was appointed as Lt. Col. Fors' legal guardian on November 20, 1980, to substitute for her deceased husband. At that time, Mrs. Fors also substituted as the plaintiff in the pending federal suit. Shortly thereafter, on December 9, 1980, the Board for Correction of Naval Records denied the Fors' application for a correction of the presumptive finding of death.

In the Spring of 1981, Capt. Johnson contacted David Fors, brother of Lt. Col. Fors, regarding the status of the lawsuit and the disposition of Lt. Col. Fors' accumulated back pay and benefits. David Fors informed Capt. Johnson that the lawsuit was continuing and that no action was requested.

The next record of communication between the Fors and the Marine Corps occurred a year later. On February 8, 1982, at the request of Capt. Johnson, Capt. Johnson's Sergeant telephoned Mrs. Fors to ask whether the family was continuing legal proceedings against the government, or if Mrs. Fors would like to accept the casualty assistance package. Mrs. Fors advised the Sergeant to contact her son, David Fors. Upon contacting David Fors, the Sergeant was told that in the absence of positive proof that Lt. Col. Fors was dead, the family would definitely continue the lawsuit. When David Fors was noti-

fied that the casualty assistance package was going to be returned to Marine Headquarters, he requested that the Sergeant hold off returning the package until the Fors' lawyer had an opportunity to contact the Corps.

On February 8, 1982, Capt. Johnson received a call from William Giffries, the attorney representing the Fors in the pending lawsuit. Mr. Giffries questioned Capt. Johnson about the disposition of Lt. Col. Fors' accumulated pay and benefits. Capt. Johnson explained that at the August 8, 1980 meeting, Henry Fors had expressed no interest in collecting the monies in question and that three attempts had been made to contact Henry Fors in early September–October 1980. Additionally, Capt. Johnson explained that he had been instructed to hold in abeyance delivery of the casualty assistance package. Mr. Giffries indicated that he would get back to Capt. Johnson concerning disposition of the casualty assistance package. No further communication took place between Mr. Giffries and Capt. Johnson regarding the casualty assistance package.

Following this exchange, in early March 1982 Mr. Giffries filed a motion in the U.S. district court to have interest payments on Lt. Col. Fors' back pay reinstated. Although there is a dispute as to whether Henry Fors was aware that interest terminated 90 days after the presumptive finding of death, in early 1982 the Fors were clearly aware that interest on Lt. Col. Fors' back pay was no longer accruing.

On August 4, 1983, the district court dismissed Mrs. Fors' complaint, holding that Mrs. Fors lacked standing to challenge the presumptive finding of death. *Fors v. Hildago*, No. C80–421T (W.D.Wash. August 4, 1983). Mrs. Fors then appealed that decision to the U.S. Court of Appeals for the Ninth Circuit.

In early 1984, the attorney handling the guardianship matters for Mrs. Fors, Mr. Hollis Barnett, contacted the Marine Corps Finance Center and requested an accounting of all funds held on behalf of Lt. Col. Fors. The accounting was needed to file an annual report concerning the guardian-

ship assets. On February 1, 1984, Mr. Charles Stinger, an attorney advisor with the Marine Corps Finance Center, provided Mr. Barnett with a breakdown of monies due Lt. Col. Fors' beneficiaries. Mr. Stinger also noted that interest on the funds ceased to accumulate 90 days after the determination of death, which was August 7, 1980.

In a series of letters over the next several months, Mr. Barnett, who evidently had been unaware that interest was no longer accruing, and the Marine Corps discussed whether the Marine Corps was obligated to pay interest on the funds. On April 27, 1984, Capt. Charles Gross of the Judge Advocate General's Office of the Department of the Navy, wrote Mr. Barnett to confirm a telephone conversation held on April 20, 1984. In this letter, Capt. Gross indicated that it was not the position of the Marine Corps that funds could not be disbursed pending the outcome of the litigation challenging the determination that Lt. Col. Fors was KIA. Instead, Capt. Gross indicated that it was his understanding that "the Fors' had refrained from accepting this money as a result of their personal convictions about their son's status."

Capt. Gross indicated that to have the funds disbursed to Mrs. Fors, it was necessary for Mrs. Fors to complete some routine paperwork. Capt. Gross indicated that a Casualty Assistance Officer would be dispatched to assist Mrs. Fors in submitting the required forms.

On May 24, 1984, Capt. Lane (Capt. Johnson's successor in Tacoma, Washington) distributed the required forms to Mrs. Fors. At this meeting, Mr. Barnett indicated that due to the pending litigation, he would request that the funds be paid to Lt. Col. Fors' guardian instead of to his heirs.

On July 12, 1984, the Assistant U.S. Attorney handling the Fors case informed Mr. Barnett that it would be necessary for Mrs. Fors to accept Lt. Col. Fors' accumulated pay and benefits as Lt. Col. Fors' heir, and not as his guardian. Shortly thereafter, on August 28, 1984, the U.S. Court of Appeals for the Ninth Circuit affirmed the district court's decision dismissing the complaint for lack of standing. *Fors v. Lehman*, 741 F.2d 1130 (9th Cir.1984).

On November 28, 1984, Mr. Barnett submitted to the Marine Corps all of the required forms necessary to recieve Lt. Col. Fors' accumulated back pay and benefits. On February 9, 1985, the United States disbursed to the estate of Lt. Col. Fors the principal, and accrued interest through November 6, 1980, in the amount of $443,-282.27.

## DISCUSSION

Plaintiff argues that the defendant wrongfully failed to pay interest after November 6, 1980 on Lt. Col. Fors' USSDP account. Plaintiff presents three grounds which plaintiff claims require the government to pay an additional $203,690.09, representing interest on Lt. Col. Fors' USSDP account from November 7, 1980 through February 8, 1985.

### A. *Statutory Basis for the Payment of Interest*

The plaintiff's first two arguments concern the interpretation and compliance with the statute and regulations under which the Marine Corps deposits and disburses the accumulated back pay and benefits of servicemembers listed as missing in action.

#### 1. *Interpretation of the Statute*

■ It is well settled that in a suit against the United States, "interest cannot be recovered unless the award of interest was affirmatively and separately contemplated by Congress." *Library of Congress v. Shaw*, 478 U.S. 310, 315–16, 106 S.Ct. 2957, 2962, 92 L.Ed.2d 250 (1986); *Brookfield Construction Co. Inc. v. United States*, 228 Ct.Cl. 551, 559, 661 F.2d 159, 165 (1981); *United States v. Mescalero Apache Tribe*, 207 Ct.Cl. 369, 380–88, 518 F.2d 1309, 1316–21 (1975), *cert. denied*, 425 U.S. 911, 96 S.Ct. 1506, 47 L.Ed.2d 761 (1976). In the absence of an express statutory or contractual provision allowing for the payment of interest, the United States cannot be liable for the payment of interest. *Library of Congress v. Shaw*, 478 U.S. at 317–18, 106 S.Ct. at 2963; *United*

*States v. Thayer–West Point Hotel,* 329 U.S. 585, 588, 67 S.Ct. 398, 399, 91 L.Ed.2d 521 (1947); *United States ex rel. Angarica v. Bayard,* 127 U.S. 251, 260, 8 S.Ct. 1156, 1160, 32 L.Ed. 159 (1888).

The no-interest rule dates back over 150 years, having been described as early as 1819 in an Opinion Letter from Attorney General William Wirt to the Secretary of the Treasury. 1 Op. Atty. Gen. 268 (1819). The Supreme Court has recently revisited the effect of the no-interest rule and concluded that "[t]he purpose of the rule is to permit the Government to 'occupy an apparently favored position,' by protecting it from claims for interest that would prevail against private parties." *Library of Congress v. Shaw,* 478 U.S. at 315–16, 106 S.Ct. at 2962 (citations omitted) (quoting *United States v. Verdier,* 164 U.S. 213, 219, 17 S.Ct. 42, 44, 41 L.Ed. 407 (1896)).

When Congress established the Court of Claims, the rule immunizing the government from awards of interest was retained, permitting interest only where expressly provided for under a contract or a statute. *See* Court of Claims Act, § 7, 12 Stat. 766 (1863). When the Claims Court was created in 1982, Congress chose to retain the no-interest rule. *See* 96 Stat. 43, 56 (1982) (codified as amended at 28 U.S.C. § 2516(a)). Section 2516(a), 28 U.S.C., provides: "Interest on a claim against the United States shall be allowed in a judgment of the United States Claims Court only under a contract or Act of Congress expressly providing for payment thereof."

The plaintiff argues that the USSDP, 10 U.S.C. § 1035, authorizes the payment of interest to a servicemember until payment is made to the servicemember or to his heirs. The relevant statute provides, in part:

> Interest at a rate prescribed by the President, not to exceed 10 percent a year, will accrue on amounts deposited under this section. However, the maximum amount upon which interest may be paid under this subsection to any member is $10,000, except that such limitation shall not apply to deposits made on or after September 1, 1966, in the case of

those members in a missing status, as defined in section 551(2) of title 37, during the Vietnam conflict. Interest under this subsection shall terminate 90 days after the member's return to the United States or its possessions.

10 U.S.C. § 1035(b).

The plaintiff indicates that there is no mention in the statute as to when interest shall terminate in the event the servicemember does not return to the United States but is declared killed in action. The statute does provide, however, that:

> Except as provided in joint regulations prescribed by the Secretaries concerned, payments of deposits, and interest thereon, may not be made to the member while he is on duty outside the United States or its possessions.

10 U.S.C. § 1035(c).

Pursuant to 10 U.S.C. § 1035, the Department of Defense has promulgated regulations to delineate more fully a servicemember's right to receive interest on his USSDP account. Section 70806 of the Department of Defense Pay and Allowance Manual (DODPM), titled "Payment of Interest Upon Final Settlement of Deposit Account," provides:

> a. General. Except when the 90–day limitation applies, interest will stop at the end of the month in which full repayment is made to the member or his heirs.
>
> b. Ninety–Day Limitation Period Upon Return From An Oversea Assignment. In no case will interest accrue for a period longer than 90 days ... after the member returns to the US or its possessions. The 90–day limitation period begins on the day of the member's arrival in the US or its possessions.

Table 7–8–2 is attached to the DODPM and illustrates the manner in which interest is paid. Rule 9 of this chart provides:

> When a member has a savings deposit account in effect under: Section–A and member is in a missing status and a finding of death is made then interest accrues to the end of the month in which repayment is made, not to exceed 90 days after the date pay and allowances terminate.

The plaintiff argues that the table may be interpreted in two ways: that repayment must be made within 90 days after pay and allowances terminate; or, that interest terminates 90 days after pay and allowances terminate. However, this ambiguity is clarified elsewhere in the regulations. Table 7–8–3 is titled "Savings Deposits–Conditions Under Which Deposits, Plus Interest, Are Repaid." Note 2 to that table states in part:

Do not continue interest beyond 90 days after the date of a member's death or his return to the US or its possessions, whichever is earlier. See Rule 9, Table 7–8–2, for death cases where a missing status is involved.

■ In light of this clarifying note, together with the congressional intent to narrowly limit situations in which the payment of interest is allowed, as manifested by the statute's general prohibition on the payment of interest, the plaintiff's claim that 10 U.S.C. § 1035 allows for the payment of interest in excess of 90 days after the death of a servicemember must fail. The regulations read together with the statute yield only one reasonable interpretation: Interest payments cease 90 days after the date of a missing servicemember's death or return to the United States. If repayment is made within this 90 day period, interest accrues to the end of the month in which repayment was made. In no case will the statute or regulations allow the payment of interest for more than 90 days after the date of the servicemember's death.

In the absence of any other statutory authority that expressly allows interest to be paid in excess of 90 days, the plaintiff is entitled to interest on Lt. Col. Fors' accumulated back pay for no more than 90 days following the determination of death.

### 2. *Compliance with Marine Corps Regulations*

The plaintiff also argues that the Marine Corps failed to comply with its regulations and, therefore, interest was payable until the Marine Corps followed the procedures contained in its regulations. Specifically, the plaintiff contends that the defendant failed to comply with certain provisions of the Marine Corps Casualty Procedures Manual (MCCPM).

The purpose of the MCCPM is to provide guidance in the administration of activities relating to notification of casualties, processing associated paperwork, and assisting the families of servicemembers. Paragraph 2005 of the MCCPM provides:

1. No firm instructions can be given to cover the varied and sometimes difficult situations that may arise in making personal notifications and/or condolence calls. However, the following general guidance is provided:

. . . .

i. Provide the next of kin general information on the casualty assistance program. Casualty Assistance Officers will not discuss any specific benefits as to amounts or beneficiaries until receipt of the casualty assistance package.

Chapter 8 of the MCCPM discusses the Casualty Assistance Calls Program. Paragraph 8002 states:

The purpose of the Casualty Assistance Calls Program is to provide information and counseling to the next of kin of deceased Marines on their rights and benefits which may have accrued to them from the Deceased Marine's military service and to render all assistance feasible in procuring these benefits.

Policy guidelines are contained in paragraph 8003, which states in part:

2. A casualty assistance call will be made on the next of kin unless it is requested that such a call not be made. In the event the next of kin express a desire not to be called on, their desires will be honored, as the individual right to privacy is paramount.

If the next of kin do not desire a casualty assistance call, paragraph 8007 instructs the Casualty Assistance Officer to limit the call "to the delivery of all forms, documents, certificates, decorations and awards as may be appropriate, and will convey to the next of kin a willingness to be of assistance." The paragraph goes on

to require the Casualty Assistance Officer to endorse the casualty assistance call assignment letter to reflect the next of kin's refusal of assistance.

■ The plaintiff argues that the Marine Corps failed to deliver to the next of kin all of the necessary forms and to assist the next of kin in filling out the forms. Plaintiff argues that until the forms were delivered and completed, no disbursement was possible. This argument is not persuasive. The evidence indicates that the Fors again and again manifested their intention *not* to accept their son's back pay and benefits.

The court notes that the task of notifying a servicemember's next of kin that the servicemember is deceased is a delicate and difficult responsibility. The MCCPM recognizes that different families handle the news of such a grievous loss differently. As such, the policies of the MCCPM recognize that when notifying families of a servicemember's loss the Marine Corps walks a narrow line between being perceived as an officious meddler, perhaps even seen as responsible for the death, and being perceived as a comforting source of assistance and support during a difficult period.

In the August 1980 condolence call, Capt. Johnson met with Henry Fors to inform him of the presumptive finding of death. Capt. Johnson discussed with Henry Fors the nature of the benefits available and the procedures necessary to obtain the benefits. Capt. Johnson informed Henry Fors that the casualty assistance package with the required forms would be arriving in the next several weeks and that Capt. Johnson would then schedule a casualty assistance call to deliver and to assist in filling out the required forms.

The record reveals that this discussion with Henry Fors was very emotional. The parties agree that at that time Henry Fors had no interest in receiving the monies and benefits, but instead wanted to have his son reclassified to MIA status. Henry Fors explained that if he were to allow his son to be reclassified as KIA, the government would no longer have a moral obligation to continue searching for his son. Although Henry Fors did not want to re-

ceive his son's accumulated back pay and benefits, Mr. Fors did not indicate an objection to scheduling a casualty assistance call with Capt. Johnson.

Three times over the next several weeks, Capt. Johnson unsuccessfully attempted to contact Henry Fors. Capt. Johnson then learned of the BCNR action and the lawsuit, both filed by Henry Fors. Capt. Johnson, concerned that his calls to Mr. Fors had not been returned and that further attempts to contact Mr. Fors could be seen as harassment, contacted his superior, Major Allord, for guidance.

Major Allord and Mr. Fors were not strangers. Major Allord had presided over the hearing that recommended Lt. Col. Fors' status change to KIA. At that hearing, Major Allord had informed Mr. Fors that if his son were reclassified as KIA, the government would disburse to Mr. Fors all back pay and allowances that had accrued in his son's USSDP account. At that hearing, Mr. Fors expressed that he was unwilling to accept the government's offer to disburse those funds.

In the period between that hearing and the date on which the presumptive finding of death was made, Major Allord had another opportunity to speak with Mr. and Mrs. Fors at a National League of Families meeting. Major Allord again informed Mr. Fors of the ramifications if a change in status of Lt. Col. Fors to KIA was made. Major Allord discussed the types of benefits that would be available. Once again, Mr. Fors indicated that he would oppose such a determination of KIA being made, that he would not accept the government's position that the status should be changed, and that he would not accept any of the benefits offered.

Mrs. Fors concurs with Major Allord's perception of Mr. Fors' position. Mrs. Fors states that her and her husband's feelings on the matter were that "[w]e just were not going to accept the money because that would be an admission that he was dead...." Dep. at 8.

Already personally aware of Mr. Fors' feelings concerning Lt. Col. Fors' back pay,

Major Allord instructed Capt. Johnson to cease further attempts to deliver the casualty assistance package following the filing of the BCNR application, the filing of the lawsuit, and Capt. Johnson's unsuccessful attempts to contact Mr. Fors.

The actions of Henry Fors and the Marine Corps at that time are understandable. The Marine Corps had ample indications that Mr. Fors did not desire at that time to receive his son's accumulated back pay and benefits. The evidence further indicates that Henry Fors was the driving force behind the challenge to Lt. Col. Fors' classification as KIA. Henry Fors' death perhaps left the family somewhat uninformed concerning the status of the accumulated benefits and back pay. Evidently, until early 1982 the family was unaware that interest on Lt. Col. Fors' back pay ceased on November 6, 1980, 90 days after the determination of death.

Henry Fors made it very clear to the Marine Corps that he did not want to receive his son's accumulated back pay and benefits. One of the policies behind the MCCPM is that an individual's right to privacy is paramount. In keeping with that policy, the Marine Corps ceased immediate efforts to deliver the casualty assistance package. The Marine Corps did, however, contact the family from time to time to determine whether they desired to receive the funds. In fact, until early 1984, at no time did the Fors request the funds. Even after the Fors learned, in early 1982, that interest was no longer being paid, the Fors did not request the funds. As soon as the Fors did request the funds, the Marine Corps acted quickly to see that the family received all of the appropriate forms and offered any assistance the family required.

The plaintiff has failed to establish that the Marine Corps violated any regulation that would justify continuing to pay interest through February 9, 1985. From the evidence available to this court, the Marine Corps made a good faith effort to assist the family and to deliver the casualty assistance package. The Marine Corps' efforts ceased when it concluded that Mr. Fors did not desire the benefits to which he was entitled.

Further, Marine Corps Order P3040.4A, which promulgated the MCCPM, expressly provides: "Instructions contained [in the MCCPM] in no way amend any provisions of regulatory publications promulgated by higher authority; where apparent conflict exists, the latter shall take precedence." Department of Defense regulations prohibit the payment of interest for more than 90 days after a servicemember's death. To the extent that the actions of the Marine Corps deviated from the guidelines contained in the MCCPM, there are no provisions in the MCCPM that mandate compensation for violations.

### B. *Duty to Invest Funds*

The plaintiff also contends that the defendant has assumed a fiduciary duty in controlling the funds of Lt. Col. Fors, and that such a duty obligated the defendant to invest those funds in a reasonable and prudent manner until repayment was made. The plaintiff suggests that this fiduciary duty springs both from statute and from common law.

#### 1. *Fiduciary Duty as Statutorily Imposed*

Plaintiff argues that the Missing Persons Act creates a trust duty by placing the Marine Corps in the position of an executor of a missing Marine's estate. The plaintiff argues that, as an executor, the Marine Corps must see that the Marine's estate is reasonably and prudently invested.

The plaintiff bases her argument on paragraph 7008 of the MCCPM, which states that "[t]he Missing Persons Act, in effect, places the Marine Corps in the position of an executor of the Marine's estate, in relation to Marine Corps pay and allowances." This statement is correct to the extent that the Marine Corps has the responsibility, while the Marine is in a missing status, to make changes in the allotment of pay and allowances in the interest of "the member, his dependents, or the United States." 37 U.S.C. § 553(e). The Marine Corps must exercise some degree

of oversight, while the Marine is in a missing status, to protect the Marine's interest in his property. *See Cherry v. United States*, 225 Ct.Cl. 312, 318–19, 640 F.2d 1184, 1188–89 (1980).

However, this oversight duty does not include investing the servicemember's account. USSDP account balances are commingled and interest payments derive from budget appropriations, not from investment of the funds. Because DODPM regulations bar the payment of interest after 90 days following a determination of death, to the extent MCCPM guidelines might possibly suggest a fiduciary duty, those guidelines do not apply to this case.

In fact, a reading of the MCCPM guidelines indicate that the guidelines do not contemplate a duty owed to the servicemember following a determination of death. Paragraph 7008 of the MCCPM continues as follows:

> The purpose of the Missing Purpose Act is essentially to authorize the Secretary of the Navy or his designee to minister to the financial needs of the absent Marine's dependents to permit them to maintain their normal standard of living until such time as an official determination is made as to the status of the absent Marine.

The plaintiff does not challenge the Marine Corps' handling of Lt. Col. Fors' estate during the period in which he was classified as missing in action. Rather, the plaintiff challenges the handling of Lt. Col. Fors' estate following an official determination of death. The relevant DODPM regulations specifically bar payment of interest after 90 days following a determination of a servicemember's death. Therefore, the MCCPM guidelines do not create a fiduciary duty to invest a servicemember's USSDP account.

### 2. *Fiduciary Duty under Common Law*

The plaintiff argues that the extent of control that the government exercised over Lt. Col. Fors' funds makes the government a common law trustee or executor, which obligates the government to reasonably invest the servicemember's funds during the period that the government held the funds. The plaintiff bases her argument on the holding in *United States v. Mitchell*, 463 U.S. 206, 103 S.Ct. 2961, 77 L.Ed.2d 580 (1983), which recognized that in certain circumstances, the government can assume the responsibilities of a trustee, and can be held liable for money damages to an injured beneficiary. *Id.* at 225–26, 103 S.Ct. at 2972–73.

The facts of this case differ significantly from the facts in the *Mitchell* case. Under the Tucker Act, a claimant must demonstrate that the substantive law on which she relies " 'can fairly be interpreted as mandating compensation by the Federal Government for the damage sustained.' " *United States v. Testan*, 424 U.S. 392, 400, 96 S.Ct. 948, 954, 47 L.Ed.2d 114 (1976) (quoting *Eastport Steamship Corporation v. United States*, 178 Ct.Cl. 599, 607, 372 F.2d 1002, 1009 (1967)).

The general rule is that a cause of action for damages against the United States "cannot be implied but must be unequivocally expressed." *United States v. King*, 395 U.S. 1, 4, 89 S.Ct. 1501, 1502, 23 L.Ed.2d 52 (1969); *see also United States v. Hopkins*, 427 U.S. 123, 128, 96 S.Ct. 2508, 2511, 49 L.Ed.2d 361 (1976). *Mitchell* involved the unique relationship that has historically existed between the United States and American Indians. In *Mitchell*, the statutes and regulations expressly created a trust. The Supreme Court found that because the statutes and regulation at issue "establish[ed] fiduciary obligations of the Government in the management and operation of Indian lands and resources, they can fairly be interpreted as mandating compensation by the Federal Government for damages sustained." *Id.* 463 U.S. at 226, 103 S.Ct. at 2972.

In this case, the statute does not expressly create a trust. Contrary to the situation in *Mitchell*, in this case specific regulatory authority existed to establish the conditions for interest payments on USSDP accounts. The statute and regulations at issue in this case commingle the

USSDP accounts of all missing Marines. Interest accrues at 10% per year, compounded quarterly. Such interest was not paid as a result of the management and investment of the USSDP funds; rather, the interest was paid out of the Marine Corps' pay appropriations. Further, the statute and regulations do not provide the Marine Corps with the discretion to invest the USSDP funds to generate interest in any other manner.

Moreover, the Marine Corps did not have discretion under the statute and regulations to extend or modify the 90 day limit on interest after the termination of pay and allowances. The Marine Corps had a statutory duty to pay interest on Lt. Col. Fors' back pay until 90 days had elapsed since the determination of death, or, if repayment was made within 90 days, to the end of the month in which repayment was made.

It is important to note that this court is not determining whether the statute imposed any fiduciary responsibilities on the Marine Corps for the period in which Lt. Col. Fors was classified as missing in action, similar to the question presented to the Court of Claims in *Cherry v. United States*, 225 Ct.Cl. 312, 640 F.2d 1184 (1980). *Cherry* involved a challenge to the Marine Corps' handling of a servicemember's USSDP account while he was missing in action.

In the case at hand, the plaintiff does not challenge the government's handling of Lt. Col. Fors' back pay for the period in which Lt. Col. Fors was missing in action. Nor does this case involve a nonpayment of interest during the period in which a servicemember was listed as missing, a status that requires the government to pay interest on accumulated back pay. In this case, where the statute and regulations specifically preclude the payment of interest 90 days after a missing servicemember is declared dead, the plaintiff cannot be awarded damages in this court for the government's failure to pay interest after the end of the 90 day period.

This court does not have the authority to award to the plaintiff more than she is expressly entitled to under the relevant statute and regulations. As this court stated in *Hoffman Construction Co. v. United States*, 7 Cl.Ct. 518, 527–28 (1985):

> Excessive delay in receiving payment places equity and justice on the side of plaintiff. However, "interest cannot be collected from the government on that basis." *Economy Plumbing & Heating Co. v. United States*, 200 Ct.Cl. 31, 46, 470 F.2d 585, 594 (1972). The Court of Claims in *Economy Plumbing & Heating Co. v. United States*, ... cited the Supreme Court which stated: "... Had Congress desired to permit the recovery of interest in situations where the Court of Claims felt it just or equitable, it could have so provided. The absence of such a provision is conclusive evidence that the court lacks any power of that nature."

### C. *Fifth Amendment Taking*

Finally, the plaintiff argues that the government's holding of the funds amounted to an unlawful taking of the servicemember's property under the Fifth Amendment to the United States Constitution for which the plaintiff is entitled to damages. The plaintiff claims that she was wrongfully deprived of the funds for over four years and is therefore entitled to just compensation for this period. The plaintiff suggests that 10 U.S.C. § 1035 establishes a reasonable measure of damages, 10% per annum, compounded quarterly.

There is no Fifth Amendment taking involved in this case. If the plaintiff had wanted the funds and had the government refused to tender those funds, the plaintiff would have had a claim for the principal and accrued interest through November 1980. Plaintiff's failure to institute an action to recover those funds, or even to make a request for those funds, does not mean the plaintiff is entitled to interest that is not otherwise expressly authorized by statute or contract. *Library of Congress v. Shaw*, 478 U.S. at 320–22, 106 S.Ct. at 2965; *United States v. Mescalero Apache Tribe*, 207 Ct.Cl. at 389, 518 F.2d at 1322.

Funds deposited in the federal treasury cannot simply be equated with private property. *Confederated Salish & Kootenai Tribes v. United States,* 175 Ct.Cl. 451, 455, *cert. denied,* 385 U.S. 921, 87 S.Ct. 228, 17 L.Ed.2d 145 (1966). This is not a case in which the government was obligated to pay interest and then failed to do so. Rather, the government was expressly precluded by statute from paying interest for more than 90 days after the servicemember's death or return to the United States.

▪ The government cannot be said to have taken plaintiff's property when the government's continued possession of the funds was a direct result of plaintiff's affirmative decision not to take possession of the funds. At any time following the determination of death, the plaintiff could have requested that her son's USSDP account balance be turned over to her. The plaintiff chose not to request these funds until late 1984. As soon as this request was made, the Marine Corps acted promptly to see that the funds were disbursed. The government's mere possession of property, without more, does not constitute a taking.

## CONCLUSION

This court is sympathetic to the grievous loss that the plaintiff and her family have suffered and shares in their hope that their son may still live. At the same time, this court is constrained to apply the rule of law that controls this case. Through the doctrine of sovereign immunity, the government of the United States does not stand in the same position in which a private party stands. Congress has legislated that the United States government will not be liable for interest payments except where authorized by statute. The statute and regulations applicable to this case terminate interest 90 days following the determination of a servicemember's death, which in this case was November 6, 1980.

For the foregoing reasons, the Clerk will enter judgment for the defendant and dismiss the complaint. Each party will bear its own costs.