EDWARD S. SMITH, Circuit Judge.
 

 While appellant, a colonel in the United States Air Force, was a prisoner of war in North Vietnam from 1965 to 1973, the Air Force paid his entire salary to his then wife. In earlier proceedings before the United States Court of Claims,
 
 [1]
 
 Colonel Cherry successfully argued that the failure of the Air Force to limit those payments upon learning that Mrs. Cherry was living with another man, had had a child with him, and was neglecting Colonel Cherry’s children, was actionable as a breach of the Air Force’s duty to appellant under the Missing Persons Act.
 
 [2]
 
 That duty was
 

 to protect Colonel Cherry’s pecuniary interests while he [was] absent. It is not required to police the fidelity of his wife, but it is to disburse his pay account with some regard to what his wishes would probably be, were he in a position to state them.
 
 [3]
 

 The Court of Claims then remanded the case to its trial division for a recommendation on quantum of damages.
 

 The United States Court of Appeals for the Federal Circuit and the United States Claims Court, on October 1,1982, succeeded to the appellate and trial jurisdictions, respectively, of the Court of Claims; hence, the trial division’s recommendation is before us now as a final judgment of the Claims Court.
 
 [4]
 

 
 *1045
 
 Appellant raises two issues on appeal. First, he argues that the Air Force erred in allotting 100 percent of his pay and benefits to Mrs. Cherry. Even prior to consideration of her conduct, he says, only about 80 percent of his pay was allottable under Air Force regulations and the remaining 20 percent should be returned to him. The Claims Court found that the 100-percent allotment was a permissible exercise of the Air Force’s discretion. Second and in addition, he argues that the Air Force should have known in early 1968 of Mrs. Cherry’s actions and should have stopped payments to her at that time. Within this second issue are three subissues:
 
 when
 
 should the Air Force have reduced allotments to Mrs. Cherry; by
 
 how much
 
 should they have been reduced; and is
 
 interest
 
 payable on the sums owed? The Claims Court held that the Air Force should have known of Mrs. Cherry’s activities in December 1969 and should have taken action by March 1970; it held that 40 percent of Colonel Cherry’s pay was properly allocable to child support (so not recoverable by him) but that all emergency funds were recoverable; and it held that interest was payable at 10 percent under the Uniformed Services Savings Deposit Program.
 
 [5]
 
 The issue of attorney’s fees was left for later proceedings.
 

 We affirm the Claims Court in most respects but remand for consideration of the modifications stated herein.
 

 I.
 

 Due to the nature of our inquiry, the facts must be set out in some detail, beginning with the Air Force pay structure. Colonel Cherry was entitled to two types of pay during his captivity: basic pay, which included base pay, basic allowance-quarters, and basic allowance-subsistence; and special pay, which included flying pay, hostile duty pay, and family separation allowance. Special pay amounted to 20 percent of his entitlement. Appellant and his family were also entitled to numerous nonmonetary benefits, including free medical care. Prior to combat duty, Colonel Cherry had completed Air Force Form 246, Record of Emergency Data, on which he indicated that Mrs. Cherry was to receive 100 percent of his entitlements upon death. However, he left blank
 
 [6]
 
 the amount to be allotted to her in the event he was missing.
 
 [7]
 

 The Air Force allotted all of Colonel Cherry’s pay, basic and special, to Mrs. Cherry. There was not at that time an interest-bearing savings account into which part of the pay could go. When the Uniformed Services Savings Deposit Program (USSDP) was instituted in early 1968, Mrs. Cherry was asked if she wanted to allocate part of Colonel Cherry’s pay to it, which she did, beginning at the rate of $200 a month and increasing to $420 a month by April 1972. However, the funds in this account were subject to emergency requests by Mrs. Cherry, of which she regularly availed herself.
 

 Soon after Colonel Cherry was shot down in October 1965, Mrs. Cherry and their four children, aged 11, 10, 8, and 5, returned to the United States from their station in Japan. She took a house in Virginia near Colonel Cherry’s sister, Mrs. Watts, and his mother. A close relationship was established which continued until about the middle of 1967 when a coolness developed.
 

 The first sign of problems, as far as the Air Force was concerned, occurred in Octo
 
 *1046
 
 ber 1967.
 
 [8]
 
 The immediate family of each prisoner of war was given an opportunity to send one Christmas package to the prisoner. At that time, the Air Force received a call from Mrs. Watts asking if she might send a package because Mrs. Cherry did not care to send one. Five months later, in March 1968, Mrs. Watts made the first of many complaints to the Air Force about Mrs. Cherry’s behavior. She reported that a man was living in the Cherry household. She repeated this allegation in November 1968, but the Air Force took no action of any kind in response to either call.
 

 In October 1968 Mrs. Cherry made her first request for emergency funds from the USSDP account. These requests, 23 of them in all, averaged $720 each and were all promptly
 
 [9]
 
 paid by the Air Force without serious challenge.
 
 [10]
 
 The requests seriously depleted the account (Mrs. Cherry withdrew nearly 80 percent, $16,520, of what was deposited) and left Colonel Cherry with $4,721 upon his return from 7 years of captivity.
 

 For our purposes, the most significant request for emergency funds was received by the Air Force on December 22,1969. In early 1969, Mrs. Cherry had become pregnant with the child of a man who had been living in the Cherry household, James Lamb. Thereafter, Mrs. Watts made her third complaint to the Air Force to inform them of the pregnancy and to express her concern that Mrs. Cherry “was just going through everything that [Colonel Cherry] had” and that “something should be done to protect some of the money for him when he came home.”
 
 [11]
 
 With that as preface, the Air Force received this emergency request for savings account funds on December 22,
 
 1969:
 

 [12]
 

 I just got out of the hospital from having a serious stomach operation. I had it done by a private doctor, since I was a little afraid, and wanted the same Doctor all the time. It was quite expensive. I’ll want to pay him off & the hospital, and the lady who kept my children. So I hate to again take money out, but I don’t want to touch our funds. If I could get $500.00 it would help, and with Christmas right here, that bill is something.
 

 Since Mrs. Cherry was entitled to free medical care, the Air Force did not immediately approve the expenditure but forwarded it to medical claims personnel — not to determine whether the withdrawal was legitimate but to be sure that Mrs. Cherry was getting all to which she was entitled. After some correspondence of this nature, her funds were approved on January 26, 1970.
 

 As they are not necessary for our disposition of the case, the events between January 1970 and Colonel Cherry’s return in January 1973 can be treated summarily. In April 1970 Mrs. Watts
 
 wrote
 
 to the Air
 
 *1047
 
 Force and finally obtained a response, but still no action was taken even though the Lamb child was common knowledge at the base. It was not until November 1972, at the instance of Lt. Mark Gartley, a personal friend of Colonel Cherry, that any investigation was planned,
 
 [13]
 
 but nothing of substance occurred between that time and Colonel Cherry’s return to this disastrous state of affairs in January 1973.
 

 II.
 

 The first issue we must consider is the decision of the Air Force, in the absence of a direct indication by Colonel Cherry on his Form 246, to allot 100 percent of his pay to Mrs. Cherry. This breaks down into two questions: (A) what is the scope of the Air Force’s discretion under the Missing Persons Act (act) and Air Force regulations, and (B) whether the Air Force abused that discretion.
 

 A.
 

 The Missing Persons Act authorizes the Secretary of the Air Force to determine allotments in the absence of a clear or adequate indication by the missing member.
 
 [14]
 
 Section 553(e) of the act limits that discretion:
 

 The total of all allotments from the pay and allowances of a member in a missing status may not be more than the amount of pay and allowances he is permitted to allot under regulations prescribed by the Secretary concerned.
 

 However tautological this provision, it indicates that allotments for Colonel Cherry are to be controlled by Air Force regulations.
 

 The relevant Air Force regulations are conflicting and we must decide which apply and which do not. Each regulation has two important formal characteristics: it
 
 regulates
 
 either the Air Force (specifically, the Air Force Accounting and Finance Center (AFAFC)) or the member himself; and it
 
 applies
 
 either to present or to missing persons. In a case of a missing person who had not indicated an allotment, the most directly applicable regulation would
 
 regulate
 
 the AFAFC (the member not being subject to military control) and would
 
 apply
 
 to missing (not present) persons. It is helpful to keep these distinctions in mind in deciphering the regulatory scheme.
 

 In support of his position that allotments to Mrs. Cherry were strictly limited by law, appellant points to Air Force Manual (AFM) 177-105, ¶¶ 20116(a) and 60615(d). Paragraph 60615(d) regulates the AFAFC and applies to missing persons, but for its substance it merely points to regulations applicable to present persons:
 

 The total of all allotments in effect may not exceed the amount the member would be permitted to allot
 
 if he were on active duty
 
 and not in a missing status. Except under unusual circumstances, a reasonable monthly balance is reserved to ensure that the member has some funds immediately available upon his return to military control. [Emphasis supplied.]
 

 AFM 177-105, ¶ 60615(d). Paragraph 20116(a) regulates members and applies to present persons. It permits allotment of all items of basic pay but no special pay, the latter of which was one-fifth of Colonel Cherry’s entitlement.
 
 [15]
 
 Colonel Cherry argues that, even before the problems with Mrs. Cherry, his special pay should not have been allotted.
 

 Against this, the Air Force cites AFM 177-131, ¶ 20512(f), which regulates the AFAFC and applies to missing persons.
 
 [16]
 
 From the time of Colonel Cherry’s capture until October 1966, paragraph 20512(f) established an allotment to “wives” of missing members of “about 75% of the missing
 
 *1048
 
 member’s unencumbered pay” and permitted “[m]ore than 75% * * * if the member has so designated in * * * [Form 246], or the circumstances warrant.” In October 1966 paragraph 20512(f) was amended to read, in pertinent part:
 

 (2) If the person designated by the member on AF Form 246 to receive his pay is a dependent, AFAFC will, unless the member has specifically indicated otherwise, pay an allotment in the approximate amount of unencumbered entitlement.
 

 The implication of these provisions is that the total pay is available for use by the family, instead of the rather artificial (for these purposes) distinction between basic pay and special pay.
 
 [17]
 
 On the basis of paragraph 20512(f), the Air Force argues that it was lawfully permitted to allot 100 percent of Colonel Cherry’s pay and the only question before the court is whether the Air Force correctly exercised its discretion in so doing.
 

 The Claims Court held, and we agree, that the Air Force’s interpretation is the superior one. Paragraph 20512(f) regulates the AFAFC and it applies to missing members only. By contrast, in relying on paragraph 20116(a) (which regulates members and applies to present persons), paragraph 60615(d) is devoid of the flexibility which ought to be the hallmark of regulations dealing with the families of missing persons.
 
 [18]
 
 Given the wide variety of circumstances of missing persons and their families, the strict basic pay rule of paragraphs 60615(d) and 20116(a) is most inappropriate.
 

 The rigid and simplistic equation of present and missing members in paragraph 60615(d) also suggests that it does not reflect a considered decision regarding the problems of a missing person’s family, pursuant to the Missing Persons Act. To take but one problem, raised by the trial judge, what was to be done with all of the special pay accumulating in the missing person’s account? As originally conceived, the money would just have sat there as there was no provision for deposit into an interest-bearing account.
 
 [19]
 
 While this situation might be tolerable where there were no dependents or few enough to live comfortably on basic pay, it would be intolerable otherwise. Refusal to allot would work no real hardship on the present member — he could always write monthly checks — but the missing member’s pay could not be reached. Furthermore, while there may be some genuine administrative convenience in refusing allotment of special pay because it is variable while a member is present, there is none with respect to the missing member whose pay is entirely administratively controlled. We conclude that the provisions in AFM 177-105, ¶¶ 60615(d) and 20116(a), are inapplicable to this situation and that AFM 177-131, ¶ 20512(f), provides the rule.
 

 B.
 

 Paragraph 20512(f) permits the allotment of 100 percent of a missing member’s pay in the present circumstances. The glaring omission of reference to dependents in the original paragraph 20512(f) (it referred only to “wives”) can only mean that the “circumstances warrant” language applies to dependent children. The revised paragraph 20512(f) apparently directs payment of a 100-percent allotment.
 

 Colonel Cherry having made no designation of a missing status allotment, it was up to the Air Force to make that determination.
 
 [20]
 
 Appellant bemoans the lack of
 
 *1049
 
 guidelines for this exercise of discretion,
 
 [21]
 
 but we have pointed out that flexibility was an important virtue here. We hold that, in view of his four minor children, the 100-per-cent allotment was a reasonable exercise of discretion under either version of paragraph 20512(f). While the Air Force made no specific findings on this point, it was not required to do so. Colonel Cherry had no other dependents,
 
 [22]
 
 so that when he was shot down there was nowhere other than to a noninterest-bearing account that the money might have gone. When the savings account possibility was presented, the Air Force encouraged Mrs. Cherry’s contribution to it in reasonable amounts.
 
 [23]
 
 We therefore conclude that the Air Force acted within its lawful authority in originally allotting 100 percent of Colonel Cherry’s pay to Mrs. Cherry, and Colonel Cherry can obtain relief only through the Air Force’s failure to reduce that amount in light of Mrs. Cherry’s conduct. To that issue we now turn.
 

 III.
 

 A.
 

 In assigning a date on which the Air Force should have known that Colonel Cherry’s interests were so compromised that a reduction in allotment was appropriate, we are guided by two important policies, both of which were followed (but for too long) by the Air Force. The first is that the Air Force’s proper concern is with the missing person’s pecuniary interests. It is neither appropriate nor desirable for the Air Force to become involved as a policeman in marital matters.
 
 [24]
 
 Second, the Air Force should have a decent respect for the spouse’s privacy and should presume good behavior. The Air Force should not investigate or interfere except with a firm basis.
 
 [25]
 

 In view of these principles, we agree with the trial court that a reduction in the allotment was not justified solely on the basis of the calls from Mrs. Watts through 1968 and 1969. They related to marital problems in which the Air Force was properly reluctant to become involved. The warnings became increasingly relevant to Colonel Cherry’s finances, however, as it became clear that Colonel Cherry’s salary was supporting people he had no wish or obligation to support. The calls and Mrs. Cherry’s apparent indifference to Colonel Cherry (the Christmas package episode) should have provided the Air Force with a context in which the true meaning of Mrs. Cherry’s December 1969 letter concerning the “serious stomach operation” was absolutely clear.
 

 The receipt of that letter, December 22, 1969, is the occurrence from which, we hold, the Air Force knew or should have known that Colonel Cherry’s pecuniary interests were seriously compromised and should have reduced the allotment. We reach this conclusion on the basis of the principles set out above. First, Mrs. Cherry was entitled to free medical care, and this should have raised an immediate question whether Colonel Cherry’s money was being spent needlessly. The use of emergency funds to pay for medical care which is a basic part of military compensation suggests problems. Second, the request was patently suspicious. In itself, without its background, this obvious waste of money should have raised questions.
 
 [26]
 
 More to the point, with the
 
 *1050
 
 background of Mrs. Watts’ calls about Mrs. Cherry’s cohabitation and pregnancy, this letter veritably shouts serious misconduct.
 

 The trial court saw this letter as the event which should have triggered an investigation, and it gave the Air Force 90 days in which to have concluded that a reduction was appropriate. On this latter point we must disagree. It seems to us that it was the prior warnings from Mrs. Watts, the previous emergency withdrawals by Mrs. Cherry, and Mrs. Cherry’s indifference to her husband that should have raised precisely those suspicions, if not an investigation. Against that background, the patently suspicious December request provided the basis for immediate action.
 

 The Claims Court candidly admitted that 90 days was but an educated guess, so we see no reason to give that figure special weight, especially in light of our differing views of the significance of the letter. While any amount of time is to an extent arbitrary, there are solid reasons to support a shorter period. First, it is desirable to achieve some clarity (and, if one may say so, neatness) in fixing liability. This we have tried to do by viewing the single event — receipt of the December request — as a critical occurrence in itself and not just the most recent in a series of clues. The Air Force’s failure to investigate accrued at one point and extended grace periods only confuse matters. Second, factually 90 days is far longer than would be needed: the clear proof of damage to Colonel Cherry’s interests was easily obtained either by a visit to Mrs. Cherry or (more respecting of her personal privacy) by a simple request for the hospital bill to verify the purpose and reasonableness of the request. The latter expedient has the further virtue of relating specifically to Colonel Cherry’s
 
 financial
 
 interests and avoiding a policing role.
 

 A 5-day period can be derived from the usual time it took the Air Force to handle Mrs. Cherry’s other emergency requests.
 
 [27]
 
 However, considering the fact that such payments were usually made almost
 
 pro forma,
 
 and the fact that this particular request arrived during a holiday period, 5 days would not in this case have been a realistic period within which to require the Air Force to react, investigate, and take action. Since it was able to react, make an investigation, and respond — although incorrectly and for the wrong reasons — on January 26, 1970, it cannot be doubted that the Air Force could have obtained the bills or other evidence of the true nature of Mrs. Cherry’s operation and on that date could have denied the request and curtailed, rather than continued, its payments to her. The Government, having filed no brief in this appeal, has provided us with no guidance, and it all but confessed judgment at oral argument. We consider it appropriate and fair to both parties in these circumstances to apply the Air Force’s own measurement to the response that it should have made to the December 1969 request. We hold that on January 26,1970, the Air Force should have curtailed payments to Mrs. Cherry.
 

 B.
 

 The next question is the amount by which Mrs. Cherry’s allotment should have been reduced. As an initial matter, it is clear that
 
 some
 
 payments should have continued because Mrs. Cherry was, however inadequately, feeding and clothing the four Cherry children. The Air Force allocated 40 percent of the total allotment to child support and suggests that this amount not be returned to Colonel Cherry. The trial judge noted, and we agree, that this intuitively seems low. However, the court does not have any real basis for altering that figure. It is an administrative determination by an agency with experience in these matters. To the extent that it is low it is to that agency’s detriment so we may further assume that it represents a good faith effort to be accurate.
 

 
 *1051
 
 Colonel Cherry, on the other hand, argues that the amount is too
 
 high,
 
 on the ground that his children were not well cared for. The evidence supports his contentions of inadequate care; nevertheless, he presents no concrete basis for reducing the amount. Our task is to reimburse Colonel Cherry, not to impose a penalty on the Air Force or on Mrs. Cherry. As the trial court recognized, lowering (or raising, for that matter) the 40 percent figure would be speculation by the court, which should be avoided. The Claims Court, however, failed to address the question of the effect, if any, on the child support of the emancipation of any of the Cherry children, two of whom would have been at least 18 years old when Colonel Cherry returned. We express no opinion on that matter and leave it to the Claims Court to make findings (if necessary) on remand.
 

 The post-1969 emergency requests seem to present a more difficult problem because many of them were justified by Mrs. Cherry on the basis of the needs of the children. There is considerable testimony in the record that some of these justifications were fictitious, and the Claims Court disallowed
 
 all
 
 emergency payments after March 1970 (reflecting its 90-day investigation period) because the Air Force did not attempt any verification of the payments as real or, if real, as reasonable. This is a sensible solution as it goes right to the heart of the Air Force’s failure to investigate the allegations about Mrs. Cherry — Colonel Cherry’s financial interests. We would only alter this to begin with the December 1969 request in accordance with our reasoning above.
 

 C.
 

 The Claims Court ruled that the only interest recoverable by Colonel Cherry was the 10 percent yield on the USSDP account into which the extra money should have been placed. (The program began in 1968 and the reductions should have begun in 1969, so the entire recovery is subject to this program.) The Claims Court correctly ruled that no other interest provision applies to this case and it correctly determined the termination date of the interest. We therefore remand to recalculate the interest on the same basis but applied to the new dates mandated above.
 

 IV.
 

 To sum up, we affirm the judgment of the Claims Court in all respects save the dates on which the Air Force should have reduced the allotment and should have investigated emergency requests. On that issue we hold that the Air Force should have stopped all emergency payments and should have investigated upon receipt of the hospital request on December 22, 1969, and should have curtailed the allotments to Mrs. Cherry on January 26,1970. We remand to the Claims Court for calculation of the amount of damages payable to Colonel Cherry and of the interest thereon, in accordance with this opinion. We also remand for consideration of what effect, if any, the emancipation of the Cherry children should have had on the allocation of the child support. Entitlement to legal fees has not yet been properly raised either to this court or to the Claims Court, so we do not express an opinion on that issue, except that it was correctly deferred below. The case is remanded for further proceedings consistent with this opinion.
 

 AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.
 

 [1]
 

 .
 
 Cherry v. United States,
 
 594 F.2d 795 (Ct.Cl.1979) , new
 
 opinion substituted on motion for relief from judgment,
 
 640 F.2d 1184 (Ct.Cl.1980).
 

 [2]
 

 . 37 U.S.C. §§ 551-558 (1976). Specifically, § 553(b) and (c) concern allotment of pay while a member is in a missing status.
 

 [3]
 

 .
 
 Cherry,
 
 640 F.2d at 1189.
 

 [4]
 

 . Federal Courts Improvement Act of 1982,
 
 *1045
 
 Pub.L. No. 97-164, 96 Stat. 25. The final judgment, based on the recommended decision of Apr. 20, 1982, was entered by the Claims Court on Oct. 8, 1982.
 

 [5]
 

 . 10 U.S.C. § 1035 (1976).
 

 [6]
 

 . Colonel Cherry states that he left this item blank on Air Force advice that by his doing so the Air Force would allot whatever was necessary to support his family.
 

 [7]
 

 . “Missing” in this context meant either missing in action or captured. Colonel Cherry was listed as missing in action (even though he had been seen to parachute safely into enemy territory) from the time he was shot down until January 1967 because the Air Force does not change missing in action status to prisoner of war until confirmation of capture is received from the enemy. This change in status has no direct bearing on the case.
 

 [8]
 

 . Appellant makes much of Mrs. Cherry’s question, at a meeting of families of prisoners of war earlier in 1967, whether it was possible to have Colonel Cherry declared dead for insurance purposes. Egregious as this sounds, the context of the question and the possibility that Colonel Cherry was still missing in action at the time may render the question less distasteful. We do not rely upon it.
 

 Other testimony concerning the nature of the relationship between Mrs. Cherry and her in-laws and Mrs. Cherry’s behavior are not directly relevant to the question of the Air Force’s knowledge.
 

 [9]
 

 . Although the record is incomplete, approval of a withdrawal generally took less than 5 days after receipt of the request; delays of only 1 or 2 days were not unusual.
 

 [10]
 

 . One gentle remonstrance to the depletion of the account was made, in July 1971, but it was met with hostility and was followed neither by the slackening of requests by Mrs. Cherry nor by the requirement by the Air Force of verification of requests.
 

 [11]
 

 . Appellant alleges that the Cherry home and children were seriously neglected and that this situation, like the pregnancy, would have been obvious upon casual investigation. The record supports this allegation.
 

 [12]
 

 . The requests were not received at the same place that Mrs. Watts made her reports, so there may be an element of incomplete knowledge involved. However, the Air Force does not seriously contend that it should be excused because its right hand did not know what its left hand was doing.
 

 [13]
 

 . The purpose of the investigation was to obtain “irrefutable evidence of marital misconduct.” It is hard to see how the birth of a child to Mrs. Cherry 4 years after Colonel Cherry’s capture could be refuted by anybody.
 

 [14]
 

 . 37 U.S.C. § 553(b).
 

 [15]
 

 . The provision in ¶ 60615(d) that a “reasonable monthly balance” should be reserved is a curious superfluity in light of the limited allotment allowed by ¶ 20116(a).
 

 [16]
 

 . Paragraph 20512 is entitled “Administration of Pay Accounts of Missing Persons.”
 

 [17]
 

 . The reference only to wives in the earlier version of ¶ 20512(f) is compensated for by the use of “circumstances” to raise the allotment in case of other dependents. From this point of view, the 1966 revision worked little change in the effect of ¶ 20512(f) but simply made it more flexible in coverage and amount.
 

 [18]
 

 .
 
 See Cherry,
 
 640 F.2d at 1187.
 

 [19]
 

 . Not until the institution of USSDP accounts in 1968 was such provision made.
 

 [20]
 

 . This is of course what Colonel Cherry, by not designating an amount, wanted the Air Force to do.
 
 See
 
 note 6,
 
 supra.
 

 [21]
 

 . He again makes the constitutional argument which was rejected before. See
 
 Cherry,
 
 640 F.2d at 1188.
 

 [22]
 

 . Colonel Cherry’s designation of 100% of his pay to go to Mrs. Cherry in case of death would reasonably lead the Air Force to assume that he would not be adverse to a 100% allotment going to her if he were missing.
 

 [23]
 

 . The ease with which she was allowed to deplete that account is a separate question, dealt with in part III of this opinion.
 

 [24]
 

 .
 
 See
 
 note 3 and accompanying quotation,
 
 supra.
 

 [25]
 

 . “Irrefutable evidence,”
 
 see
 
 note 13,
 
 supra,
 
 may have been too deferential a standard, but in our view such a standard was easily met by the birth of the child to Mrs. Cherry in 1969.
 

 [26]
 

 . It did, in a limited sense. The request was sent to medical benefits personnel, who contacted Mrs. Cherry to be sure that she was aware of her entitlements. Apparently no concern whatever was given to the pecuniary in
 
 *1050
 
 terests of the Service itself, in providing the medical care to which Mrs. Cherry was entitled but which she avoided.
 

 [27]
 

 .
 
 See
 
 note 9,
 
 supra.