Marianne B. FUGATE for herself and as wife and Conservator of the Estate of Paul Fugate, Plaintiff,

v.

UNITED STATES of America, Defendant.

No. 45–83C.

United States Claims Court.

May 3, 1988.

W. Edward Morgan, Washington, D.C., Atty. of Record, for plaintiff.

Mary Mitchelson, Washington, D.C., with whom was Asst. Atty. Gen. Richard K. Willard, for defendant. David M. Cohen, Director, Washington, D.C., of counsel.

## OPINION

NAPIER, Judge:

This case involves a complaint by the wife of a National Park Service ranger alleging an erroneous agency determination regarding the status of her husband under the "Missing Employees Act," and her consequent claim that she was deprived of benefits which arose incident to that decision. In response, the United States

filed a counter-claim seeking $6,950.00 in allotments paid to plaintiff from her husband's salary during the time that he was determined to be "missing" by the National Park Service.

The action now comes before this Court on "Defendant's Renewed Motion for Summary Judgment", pursuant to Rule 56 RUSCC. Defendant contends there are no material issues of fact in dispute and it is entitled to judgment as a matter of law. Defendant also seeks summary judgment on its counterclaim.

After hearing oral argument, and reviewing the submissions of the parties, relevant statutes and applicable case law, the Court concludes that defendant's renewed motion for summary judgment regarding plaintiff's claim must be granted. That portion of defendant's renewed motion regarding its counterclaim must be denied.

### Facts

On January 13, 1980, at approximately 3:00 p.m., Paul Fugate, a park ranger, employed by the National Park Service (NPS) at Chiricahua National Monument (Chiricahua) in Cochise County Arizona, left the Visitor's Center after informing a co-worker that he was going to check some hiking trails on the Chiricahua grounds. Mr. Fugate never returned and no conclusive evidence of his death, or his continued life, has ever been established.

An extensive search of the Chiricahua area was conducted immediately after Mr. Fugate's disappearance. The National Park Service, the Cochise County Sheriff's Department, other federal and local agencies and private citizens were involved in the search. No definitive answer as to Mr. Fugate's whereabouts was ever discovered.

On April 1, 1980, Howard H. Chapman, Western Regional Director of the National Park Service, acting as the appointed designee of the Secretary of the Department of the Interior, officially declared Mr. Fugate a "missing person", pursuant to the "Missing Employees Act," (MEA)[1] 5 U.S.C.

---

1. The MEA is derived from what was formerly known as the "Missing Persons Act" (MPA),

which was enacted in 1942. Pub.L. No. 77–490, 56 Stat. 143, 50 U.S.C.App. § 1001, et seq. That

§§ 5561, et seq. By letter dated April 2, 1980, Mr. Chapman notified plaintiff, Marianne B. Fugate, Paul Fugate's wife, that he was establishing a trust account on behalf of Mr. Fugate [2] and requested certain information in order to determine whether an allotment should be made to the plaintiff.[3] Consequently, plaintiff was granted a monthly allotment of $525.00 beginning June 15, 1980. In July of 1980, plaintiff provided Mr. Chapman with documentation of her financial need, whereupon he increased her allotment to $800.00 per month.

On July 16, 1980, Detective Pat Hanley of the United States Park Police issued a report in which he concluded that Paul Fugate had disappeared of his own volition. Detective Hanley had been sent to Chiricahua to review the original investigation of Paul Fugate's disappearance which had been conducted by Lt. Craig Emmanuel, the Chief Investigator of the Cochise County Sheriff's Department.

On January 29, 1981, Mr. Chapman wrote plaintiff a letter informing her that her husband's disappearance was under review.[4] In that letter, Mr. Chapman told plaintiff "[i]f you have any updated information which might assist us, we would appreciate hearing from you as soon as possible." He also informed plaintiff by letter of the three possible alternatives which could result from the review:

1. We continue Paul in a missing status, based upon available information/evidence that would indicate he is still alive;

2. Declare Paul dead, based upon available information/evidence that would indicate such; and,

3. Declare Paul absent from duty without authority, based upon available information/evidence that would indicate such.

That letter continued:

A determination under item 1 would result in a continuance of his missing status. Salary payments to you would continue subject to any new information on Paul's status. Should a determination be made under item 2 or 3, the action to be taken would be to (1) separate Paul from the National Park Service and (2) terminate salary payments to you.

On February 9, 1981, plaintiff responded to Mr. Chapman requesting that the NPS not act hastily "allowing the situation to remain as flexible as possible until some more clear cut evidence becomes available." Plaintiff expressed her concern regarding apparent "communication gaps" between the various persons and agencies that had investigated her husband's disappearance and stated that she was skeptical of the thoroughness of Detective Hanley's

---

Act covered both civilian and military personnel of the federal Government. In 1966, Congress codified a military version of the Missing Persons Act in 37 U.S.C. §§ 551–58 and a civilian version in 5 U.S.C. §§ 5561–68. Pub.L. No. 89–554, 80 Stat. 378. This codification was intended to make no substantive change in the existing law. The reports from both houses of Congress dealing with the proposed legislation which became Pub.L. No. 89–554 make clear that the bill was intended merely to codify existing law and not to enact substantive changes:

The purpose of this bill is to restate in comprehensive form, without substantive change, the statutes in effect before July 1, 1965, that relates to Government employees, the organization and powers of Federal agencies generally, and administrative procedure, and to enact title 5 of the United States Code.

H.R.Rep. No. 901, 89th Cong., 1st Sess. 1 (Aug. 31, 1965); S.Rep. No. 1380, 89th Cong. 2nd Sess. 18 U.S.Code Cong. & Admin.News 1966, p. 429 (July 21, 1966).

2. An employee in a missing status is entitled to have all pay and allowances due him credited to his account, under 5 U.S.C. § 5562.

3. The head of an agency or his designee "may direct the initiation, continuance, discontinuance, increase, decrease, suspension, or resumption of an allotment from the pay and allowances of an employee in a missing status when that action is in the interests of the employee, his dependents, or the United States." 5 U.S.C. § 5563(e). The decision regarding whether or not to issue an allotment is thus, left to the discretion of the head of the agency or his designee, and to be determined in "good faith."

4. The Missing Employees Act requires the head of the agency concerned to have a case fully reviewed if "an employee has been in a missing status almost 12 months and no official report of his death or the circumstances of his continued absence has been received * * *." 5 U.S.C. § 5565(a).

investigation. Plaintiff informed Mr. Chapman that Lt. Emmanuel was following up a number of leads, including an alleged sighting of Paul Fugate in New Mexico on Labor Day 1980.[5] During the review period, the NPS regularly contacted Lt. Emmanuel to determine the status of his investigation.

By letter dated February 23, 1981, Mr. Chapman informed plaintiff of Detective Hanley's conclusions and advised her that her husband's status was being changed from "missing" to "absent from duty without authority" (AWA). The letter stated that as a result of this new determination, action was being taken to terminate Paul Fugate's employment with the NPS and to stop his salary and, that as a result, plaintiff's allotments would cease. Plaintiff was also notified that allotments already issued to her would have to be paid back to defendant. She was informed that failure to satisfy that debt would result in attachment of her husband's retirement fund.

On March 18, 1981, the NPS sent plaintiff a letter supplying her with official documentation separating Paul Fugate from the NPS for abandonment of his position. By letter dated June 16, 1981, Mr. Chapman informed plaintiff that the NPS could not waive its collection of the allotments previously issued to her, as she had requested, and would collect its money by placing an administrative lien on Paul Fugate's retirement account.

Subsequently, plaintiff filed an appeal of Mr. Fugate's removal with the Merit Systems Protection Board (MSPB). The presiding official held that Mrs. Fugate did not have standing to appeal her husband's removal from service with the NPS and dismissed her appeal.[6] Plaintiff's petition for review of that decision was granted. However, the Board affirmed the presiding official's decision.[7] The United States Court of Appeals for the Federal Circuit affirmed the decision of the MSPB.[8]

On February 3, 1983, plaintiff filed a complaint in this Court seeking a determination that the defendant had illegally terminated her allotments since its determination that Paul Fugate was AWA was not substantiated. Plaintiff also asked the Court to rule on the issue of whether or not she, or Paul Fugate's retirement account, could be indebted for the allotments she had received. The defendant filed its answer on August 25, 1983, and simultaneously counterclaimed for the total amount of allotments ($6,950.00) it had paid to plaintiff from January 1980 to February 1981. On February 13, 1984, defendant filed its motion for summary judgment.

Oral argument was held concerning the defendant's motion, and by Order dated May 29, 1985, Judge Seto directed the National Park Service to reconsider its determination that Paul Fugate was AWA, taking into consideration all relevant evidence that had subsequently developed. That order also directed the NPS to review the possibility of waiving the recovery of allotment payments to the plaintiff in the event the agency sustained its earlier decision.

To comply with Judge Seto's Order, Mr. Chapman established an Action Plan Committee consisting of five Park Service officials. This group decided that the review would be facilitated best by designating a career Park Service law enforcement ranger, who had no involvement in the 1981 decision, to conduct an oversight investigation of all existing evidence concerning Paul Fugate's disappearance. That ranger was also to make further inquiry where necessary, and engage an independent consultant to assist him in the review of the evidence.

5. In February 1981, Detective Hanley investigated this alleged sighting of Paul Fugate and concluded that it had been a case of mistaken identification.

6. *Fugate v. Dept. of the Interior,* Decision No. SFO7528110812 of the Merit Systems Protection Board, September 17, 1981.

7. *Fugate v. Dept. of the Interior,* 19 M.S.P.R. 506 (1984).

8. *Fugate v. Merit Systems Protection Board,* 765 F.2d 162 (Fed.Cir.1985).

*Development of the Record*

Mr. Chapman designated Park Ranger Peter K. Nigh as the career Park Service law enforcement official to conduct the investigation. Ranger Nigh had been an instructor of law enforcement at the Albright Training Center and Federal Law Enforcement Training Center for over 5 years, as well as having served as a ranger at various locations. As the outside consultant, Mr. Chapman engaged Charles E. Scott, a private investigator from Mesa, Arizona. Mr. Scott has been involved in law enforcement work for over 30 years.

Ranger Nigh began his review by spending 3 days in the Park Service Western Region Office in San Francisco, reviewing the administrative files and talking with individuals who had been involved in the investigation. Based upon this review, he and Mr. Scott developed the areas they wished to address.

Mr. Scott interviewed Lt. Emmanuel and found that after a number of years of investigating Paul Fugate's disappearance, Lt. Emmanuel had come to the conclusion that Mr. Fugate had been the victim of homicide. Mr. Scott also reviewed the scope of Lt. Emmanuel's investigation and concluded that he had done a thorough job. Both Ranger Nigh and Mr. Scott concurred in Lt. Emmanuel's conclusion that there was substantial evidence to support the conclusion that Mr. Fugate was a victim of homicide.

Mr. Scott also attempted to obtain the grand jury records related to the homicide investigation. He was informed by the Cochise County Attorney that those records were sealed and could not be obtained without a court order. However, he was assured that there was no information in the grand jury records that was not already in the investigative file.

Ranger Nigh and Mr. Scott learned that few leads existed in the case until 1983, when a suspect was uncovered in Wisconsin. The suspect and his girlfriend were eventually brought to Arizona where both submitted to a polygraph examination. According to the polygraph examiner, the suspect's performance on the examination was dubious, leading to the suspicion that he had been involved in the disappearance of Paul Fugate in some manner. The suspect's girlfriend reported that the suspect had stated that he had killed a police officer in Arizona.[9]

Upon completing his investigation, Ranger Nigh concluded that the evidence[10] available indicated that Paul Fugate was most likely the victim of homicide. Thus, Ranger Nigh suggested that Paul Fugate was not a "missing" person, but a deceased person whose body had not been located.

Mr. Chapman reviewed all the information submitted to him by Ranger Nigh and Mr. Scott, as well as a 25–page statement with 25 appendices that had been submitted to him by the plaintiff. This information constituted the record before the agency.

After reviewing the record, Mr. Chapman concluded that the information and evidence developed since his 1981 decision did not support his earlier conclusion that Paul Fugate had voluntarily abandoned his post of duty. Alternatively, Mr. Chapman concluded, that the evidence established a reasonable presumption that Paul Fugate had been a victim of homicide on January 13, 1980—the day he was first discovered to be missing. His determination, filed in this Court on December 5, 1985, was accompanied by a detailed report of the investigation and the findings of the Action Plan Committee· which had been established.

---

9. Paul Fugate, at the time of his disappearance, had been wearing a Park Ranger's uniform and, thus, could have been mistaken for a police officer.

10. Specifically, Ranger Nigh stated his conclusion was supported by the fact that the deception detected by the polygraph examinations given to the suspect in Mr. Fugate's disappearance had caused the Cochise County Sheriff's Department to change the nature of that investigation from a missing person to a homicide, indicating their belief that Paul Fugate was dead. Also, Ranger Nigh stated that it was his belief that it would be very difficult for a missing person to remain totally undetected for almost 6 years without some clue to his whereabouts, if he was alive.

Thereafter, on March 6, 1986, defendant filed a "Renewed Motion for Summary Judgment." Plaintiff filed a response to that motion on May 27, 1986. The Court held status conferences on May 27 and August 5, 1987. The parties were unable to reach settlement and the Court heard oral argument on defendant's renewed motion on September 30, 1987.

### Discussion

Jurisdiction is proper in this Court under 28 U.S.C. § 1491(a)(1), which vests jurisdiction in the Claims Court over claims against the United States founded on "any Act of Congress or any regulation of an executive department * * *." This action stems from a dispute regarding a federal agency determination made pursuant to the law established by Congress governing "Payments To Missing Employees." 5 U.S.C. § 5561, et seq.

Plaintiff contests the cessation of salary allotments she had been receiving after her husband disappeared. The NPS discontinued those allotments when it declared her husband AWA, and the agency refused to reinstate them when it later determined her husband to be dead. The MEA does not prescribe the standard of judicial review applicable to a contested agency status determination regarding an employee that cannot be located, nor does it prescribe the standard of judicial review applicable to an action contesting a termination of allotments.

▮ The NPS' determination of Paul Fugate's death and corresponding date thereof, were conclusions based on extrapolation of the facts in the record before the agency. In *Association of Data Processing Service Organizations, Inc. v. Board of Governors of the Federal Reserve System,* 745 F.2d 677 (D.C. Cir.1984), Judge Scalia discussed the standard of judicial review applicable when a court tests a factual foundation upon which an agency's determination was based.

[I]n their application to the requirement of factual support the substantial evidence test and the arbitrary or capricious test are one and the same. The former is only a specific application of the latter * * *.

\* \* \* \* \* \*

Thus, an agency action which is supported by the required substantial evidence may in another regard be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" —for example, because it is an abrupt and unexplained departure from agency precedent.

\* \* \* \* \* \*

When the arbitrary or capricious standard is performing that function of assuring factual support, there is no *substantive* difference between what it requires and what would be required by the substantial evidence test * * *.

745 F.2d at 683–84. Thus this Court's review of the NPS' determination will focus on whether or not that decision was supported by substantial evidence in the record before the agency. If the Court finds the agency decision was supported by substantial evidence, then the Court must only be assured that the agency's ultimate conclusion was not arbitrary and capricious in light of that support.

▮ Because plaintiff is seeking a money judgment regarding the allotments to which she claims entitlement, she "is not barred from litigating the incidental, though necessary, question" of Paul Fugate's status. *Midgett v. United States,* 221 Ct.Cl. 171, 177, 603 F.2d 835, 838 (1979). The "action is not one for declaratory judgment alone, which we are without jurisdiction to hear." *Midgett,* 221 at 177, 603 F.2d at 838 (citing *United States v. King,* 395 U.S. 1, 89 S.Ct. 1501, 23 L.Ed.2d 52 (1969), *rev'g,* 182 Ct.Cl. 631, 390 F.2d 894 (1968)).

### Status Determination

Section 5565 of the Missing Employees Act entitled "Agency Review" states:

(a) When an employee has been in a missing status almost 12 months and no official report of his death or the circumstances of his continued absence has been received by the head of the agency

concerned, he shall have the case fully reviewed. After that review and the end of 12 months in a missing status, or after any later review which shall be made when warranted by information received or other circumstances, the head of the agency concerned or his designee may—

(1) direct the continuance of his missing status, if there is a reasonable presumption that the employee is alive; or

(2) make a finding of death.

(b) When a finding of death is made under subsection (a) of this section, it shall include the date death is presumed to have occurred for the purpose of the ending of crediting pay and allowances and settlement of accounts. That date is—

(1) the day after the day on which the 12 months in a missing status ends; or

(2) a day determined by the head of the agency concerned or his designee when the missing status has been continued under subsection (a) of this section.

(c) For the purpose of determining status under this section, a dependent of an employee in active service is deemed an employee. A determination under this section made by the head of the agency concerned or his designee is conclusive on all other agencies of the United States. This section does not entitle a dependent to pay, allowances, or other compensation to which he is not otherwise entitled.

It is clear from reading the statute that Congress explicitly delegated the authority to review the status determination of a missing employee to the head of the agency involved. Based on that review, the head of the agency is then given discretion to "direct the continuance of the missing status if there is a reasonable presumption that the employee is alive," or "make a finding of death." The only restriction that Congress placed on this delegation of authority and discretion is that the agency head "shall have the case fully reviewed," before he makes his determination.

Once a finding of death is made under section 5565(a)(2), above, the head of the agency "shall include the date death is presumed to have occurred," and that date shall be either "the day after the day on which the 12 months in a missing status ends," or "a day determined by the head of the agency concerned or his designee when the missing status has been continued under subsection (a) * * *." 5 U.S.C. § 5565(b). Section 5565(c) states that a "determination under this section made by the head of the agency concerned or his designee is conclusive on all other agencies of the United States." Case law interpreting these sections of Title 5 have noted that "[t]he discretion give to the Secretary [of an agency] or his designee by the Missing Persons Act is extensive." *Luna v. United States*, 810 F.2d 1105, 1107 (Fed.Cir. 1987) (citing *Cherry v. United States*, 225 Ct.Cl. 312, 640 F.2d 1184, 1196 (1980) (Cherry I)). Further, "[i]t requires an extraordinary case * * * for us to conclude that the Secretary abused his discretion." *Luna*, 810 F.2d at 1108 (quoting *Pitchford v. United States*, 229 Ct.Cl. 114, 666 F.2d 533, 535 (1981)).

▮ Plaintiff argues that a section of Arizona's Probate Code, Ariz.Rev.Stat.Ann. § 14–1107, that dictates when a missing person is to be presumed dead, should have been utilized by the NPS in order to determine Paul Fugate's date of death. However, the law applicable to the instant case, i.e., the Missing Employees Act, like other similar statutes which have been construed by the courts,

is federal legislation administered by a national agency, intended to solve a national problem on a national scale * * *. It is an Act, therefore, in reference to which it is not only proper but necessary for us to assume, "in the absence of a plain indication to the contrary, that Congress * * * is not making the application of the federal act dependent on state law." *Jerome v. United States*, 318 U.S. 101, 104, 63 S.Ct. 483, 485, 87 L.Ed. 640.

*NLRB v. Hearst Publications*, 322 U.S. 111, 123, 64 S.Ct. 851, 857, 88 L.Ed. 1170 (1944) (construing the Wagner Act).

Further, the Supreme Court stated:

Nothing in the statute's background, history, terms or purposes indicates its scope is to be limited by such varying local conceptions, either statutory or judicial, or that it is to be administered in accordance with whatever different standards the respective states may see fit to adopt for the disposition of unrelated local problems.

*Hearst Publications,* 322 U.S. at 123, 64 S.Ct. at 857.

The plain language of the Missing Employee's Act directs that the head of the agency make a determination of "missing" or "dead" based on the information he has available to him.

During oral argument, plaintiff placed great emphasis on *Midgett v. United States,* 221 Ct.Cl. 171, 603 F2d 835 (1979). In *Midgett,* the Court of Claims was called upon to determine whether the Army Board for Correction of Military Records (ABCMR) had erroneously refused to change a missing soldier's status from "absent without leave" (AWOL) to "dead." Defendant in *Midgett* argued that the Court of Claims was "without jurisdiction to alter prior determinations of the status of military personnel." *Midgett,* 221 Ct.Cl. at 180, 603 F.2d at 840. The Court of Claims in *Midgett* concluded that authority construing the Missing Persons Act has "dismiss[ed] out of hand defendant's suggestion that the determinations were expressly intended * * * to be nonreviewable and conclusive." *Id.* (quoting *Crone v. United States,* 210 Ct.Cl. 499, 521, 538 F.2d 875, 877 (1976)).

However, the Court in *Midgett* went on to state that a party contesting a status determination made under the MPA is bound by the agency's determination "unless he can meet the difficult standard of proof that the [agency's] decision was illegal because it was arbitrary, or capricious, or in bad faith, or unsupported by substantial evidence, or contrary to law, regulation, or mandatory published procedure of a substantive nature by which plaintiff has been seriously prejudiced, and money is due." *Midgett,* 221 Ct.Cl. at 180, 603 F.2d at 840 (quoting *Sanders v. United States,* 219 Ct.Cl. 285, 298, 594 F.2d 804, 811 (1979)). The Court must therefore limit its review to the question of whether or not the decision of the NPS, that Paul Fugate died on January 13, 1980, was arbitrary or capricious or not supported by substantial evidence.

In determining whether [the agency's] decision is supported by substantial evidence, the standard is not what the court would believe on a *de novo* appraisal, but whether the administrative determination is supported by substantial evidence on the record as a whole.

*Brewer v. United States Postal Service,* 227 Ct.Cl. 276, 279, 647 F.2d 1093, 1096 (1981), *cert. denied,* 454 U.S. 1144, 102 S.Ct. 1005, 71 L.Ed.2d 296 (1982) (citing *Pascal v. United States,* 211 Ct.Cl. 183, 188, 543 F.2d 1284, 1287 (1976)).

In *Midgett,* the court stated:

In circumstances where a determination of status is required, and *no* evidence available would justify one choice or another, an administrative presumption of a particular status based on a policy rational * * * might be justified. Thus, the ABCMR's determination of Midgett's status might be justified if there was *no* evidence to the contrary.

*Midgett,* 221 Ct.Cl. at 188–89, 603 F.2d at 845. In *Midgett,* plaintiffs had presented evidence that their son had not deserted, but had been killed, and requested that his military records be adjusted accordingly. Unlike *Midgett,* plaintiff in the instant case has presented no plausible evidence that would suggest her husband's life continued after the date of his disappearance. As the record in this case reveals, experienced and qualified law enforcement personnel, as well as a private investigator, conducted an extensive investigation and concluded that Paul Fugate was a victim of homicide on January 13, 1980. The NPS may rely on their determination which was based on a solid record constituting substantial evidence. Their application of that evidence in reaching a final conclusion that Mr. Fugate was dead was not arbitrary or capricious. Indeed, the passage now of more than 8 years since Mr. Fugate's last known

contact makes such a determination even more compelling. It stands in sharp contrast to the original determination made in *Midgett*, which the court found "was based on nothing more than administrative convenience and a hearsay statement, uncorroborated and of questionable probative value * * *." *Midgett*, 221 Ct.Cl. at 184, 603 F.2d at 842.

■ A status determination made by an agency under the Missing Employees Act, is rebuttable. *Midgett*, 221 Ct.Cl. at 190, 603 F.2d at 848. However, great deference is given to the decision of the agency, and consequently, a moving party must overcome a great burden to convince a court to overturn an alleged erroneous agency determination.

> To recover for failure to correct an alleged injustice, such as perhaps based on gross material error of fact or an action contrary to all evidence, it must be proved that such failure was arbitrary and capricious, or in bad faith, or contrary to law, or without rational basis, seriously prejudicial to plaintiff, and with monetary consequencies. In such event, the abuse of administrative discretion rises to the level of legal error which merits judicial relief. These are comparatively rare cases. Perhaps they are infrequent because the proof must overcome the strong, but rebuttable, presumption that administrators [of agencies] like other public officers, discharge their duties correctly, lawfully, and in good faith. (Citations omitted.)

*Sanders*, 219 Ct.Cl. at 301–02, 594 F.2d at 813.

The presumption that agency officials act in good faith is a premise axiomatic to the very existence of government agencies. If it is not upheld, and accepted, the very fabric of administrative process will soon unravel.

■ Since Paul Fugate has never been found, it cannot be disputed that a conclusion contrary to the one reached by the NPS regarding his status could have been reached. Even if this Court was swayed to a decision contrary to the one reached by the NPS, it cannot substitute its own judg-

ment for that of the agency's as long as the NPS' decision was justifiably based on substantial evidence in the record before it, and thus, not arbitrary and capricious. *See* e.g., *Snell v. United States*, 168 Ct.Cl. 219, 227 (1964). Contrary subjective determinations may often be reached by reasonable minds considering the same evidence. However, deference is given to the agency in the absence of a clear abuse of discretion and the agency's determination must be upheld by the courts.

The National Park Service did not make its final determination that Paul Fugate had died on the date of his disappearance until almost 5 years had elapsed with no concrete indications of Mr. Fugate's continued existence. All reasonable leads had been followed but to no avail. Polygraph examinations were administered to a suspect regarding Paul Fugate's disappearance and an experienced polygraph examiner concluded that the suspect had either killed Paul Fugate or had knowledge of the facts surrounding his disappearance. In addition, plaintiff supplied the NPS with all the information she had regarding her husband's alleged continued existence. The record upon which the NPS based its determination has been reviewed by this Court, as well as the procedures used by the NPS in the creation and consideration of that record. The Court concludes that Mr. Chapman, Regional Director of the National Park Service, acting as the designee of the Secretary of the Department of the Interior, acted in good faith and justifiably based his decision on substantial evidence when he determined that Paul Fugate was killed on January 13, 1980.

To go behind an agency decision which is grounded on a rational basis, even though it may not be the only reasonable conclusion which could have been reached, would put this Court in the awkward position of substituting its judgment for the technical expertise of administrative officials who are trained in agency procedure, and, thus, vitiate the entire administrative scheme contemplated in the statute. As the Court of Claims has stated:

We do not think that we should lightly substitute judicial oversight for that of the executive branch in an area where practical considerations of administration and experience should be paramount and where the executive's prerogative and responsibility is to take expeditious action to insure the efficiency and discipline of the huge federal bureaucracy in the interests of good government.

*Wathen v. United States*, 208 Ct.Cl. 342, 353, 527 F.2d 1191, 1197–98 (1975).

### Deprivation of Allotments

The Missing Employees Act authorizes continuation of pay and allowances to employees, as defined under the Act, while they are in a missing status. The Act authorizes the head of the agency, or his designee, which employed the missing person, to initiate, continue, discontinue or alter pay allotments "from the pay and allowances of an employee in a missing status when that action is in the interests of the employee, his dependents, or the United States." 5 U.S.C. § 5563(e). Thus, the question before the Court is, whether the head of the NPS correctly exercised his discretion when he terminated plaintiff's allotments when her husband's status was changed from "missing" to AWA.

Section 5562 of the Missing Employees Act governs pay and allowances to missing employees and their dependents. In pertinent part, it states:

An employee who is officially determined to be absent from his post of duty without authority is indebted to the United States for payments of amounts credited to his account under subsection (a) of this section for the period of that absence.

5 U.S.C. § 5562(c).

The plain language of section 5562 makes it clear that once an employee is determined to be AWA, all pay and allowances to him cease. Additionally, it states that if an employee, originally thought to be missing, is later determined to be AWA, all amounts paid out to him while he was in a missing status are to be repaid to the Government. Therefore, once the NPS de-

termined Paul Fugate to be AWA, his pay and allowances from the NPS were terminated. Accordingly, no allotments could then be awarded to plaintiff from his pay and allowances, since in fact, they statutorily no longer existed. The Court appreciates the predicament plaintiff was placed in by defendant's termination of her allotments. However, the Congressional mandate conveyed in the plain language of the statute must be upheld. The NPS was acting within its delegated authority when it terminated plaintiff's allotments upon determining that her husband was AWA.

▮ Plaintiff claims that the decision to terminate these allotments without affording her a full adjudicative hearing deprived her of property without due process of law. However, section 5563(e), clearly vests discretion with the head of the agency to take whatever action he believes in good faith, to be in the "interests of the employee, his dependents, or the United States." Termination of pay and allowances upon a finding that an employee has deserted his post is in the interest of protecting the treasury of the United States. Thus, plaintiff had no constitutionally-protected property interest in the allotments. They were to be dispersed, in good faith, at the discretion of the head of the agency.

> To have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it.

*Board of Regents of State Colleges v. Roth*, 408 U.S. 564, 577, 92 S.Ct. 2701, 2709, 33 L.Ed.2d 548 (1972).

Allotments from a missing employee's pay and allowances are given, under the MEA, at the discretion of the head of the agency. He may not arbitrarily commence or terminate these allotment payments. To uphold the statute he must exercise his discretion in good faith. In this case, the head of the NPS, in good faith as demonstrated in the record, concluded that termination of plaintiff's allotments was proper under the statute.

In *Cherry v. United States*, 225 Ct.Cl. 312, 640 F.2d 1184 (1980), *aff'd in part, rev'd in part and remanded*, 697 F.2d 1043 (Fed.Cir.1983), an action for recovery of military pay that a soldier claimed had been dispersed to his wife, to his disadvantage, while he was missing plaintiff claimed that the Missing Persons Act violated constitutional due process guarantees since it did not grant him, or a guardian of his, an opportunity to be heard before any actions regarding allotments from his pay were taken. The court in *Cherry* declared that "[c]learly to do this would have much better respected the equality of treatment of servicemen, and dependents, as the statute implicitly requires, but we do not hold it is constitutionally necessary." *Cherry*, 225 Ct.Cl. at 317, 640 F.2d at 1188. The Court continued:

> The main reason why we think the statute is constitutional is because in reading § 553(e) we find it implicit that Congress intended that the Secretary should exercise his/her discretion fairly and carefully. There is a general substantial requirement that, to be valid, and administrative determination must not be made arbitrarily.
>
>    *    *    *    *    *    *
>
> However, it is not necessary that the Secretary assume the role of trustee in order to exercise the statutory duties in a manner that is constitutionally sufficient. As we explained above, all that is required of him is that he exercise the statutorily granted discretion fairly, without abusing it.[11]

*Cherry*, 225 Ct.Cl. at 317–18, 640 F.2d at 1188.

Thus, it is clear that the Missing Employees Act gives great discretion to the Secretary of the involved agency with regard to allotments from a missing employee's pay. Furthermore, if that employee's status is changed to AWA, as was the plaintiff's husband, section 5562 of the Act requires that the employee's pay and allowances

cease. The Act has been held not to violate any constitutionally-protected interest by its delegation of discretion to the Secretary. Accordingly, plaintiff's claim that her constitutional rights were infringed upon must fail.

It must be noted that at the time the NPS changed Mr. Fugate's status from "missing" to AWA, it did so based upon the record before it at that time. When the NPS later determined Mr. Fugate to be deceased, its decision was supported by evidence collected subsequent to the time of the AWA determination. Although the agency later altered the AWA determination, it cannot be said that at the time the agency issued it, it was an arbitrary and capricious determination. It was based on the substantial evidence in the whole record before the agency at that time. When Mr. Fugate was declared dead by the agency, his pay and allowances ceased pursuant to 5 U.S.C. § 5562(b)(2). Additionally, once the NPS determined that Mr. Fugate had died, plaintiff became entitled to benefits incident to that determination.[12]

### *Counterclaim*

■ Defendant counterclaims for the allotments paid to plaintiff during the period that her husband was declared as "missing." As discussed, above, section 5562(c) of the Missing Employees Act states that an employee "determined to be absent from his post of duty without authority is indebted to the United States for payments of amounts credited to his account [or allocated therefrom] * * * for the period of that absence." However, section 5562(c) must be read in conjunction with section 5566 of the Act which states, in pertinent part:

> an allotment paid from the pay and allowances of an employee for the period he in a missing status may not be collected from the allottee as an overpayment

---

11. On appeal, the United States Court of Appeals for the Federal Circuit, affirmed this portion of the Court of Claims opinion. *See Cherry v. United States*, 697 F.2d 1043, 1051 (Fed.Cir. 1983).

12. During oral argument, plaintiff acknowledged that efforts to collect these death benefits had begun.

when payment was caused by delay in receiving evidence of death.

5 U.S.C. § 5566(f).

Although defendant did first declare Mr. Fugate AWA, it later determined, based upon subsequently received evidence, that he had died on the date he originally disappeared. Thus, the alleged overpayment by the Government was, in fact, due to a "delay in receiving evidence of death." The defendant's counterclaim is denied.

### Conclusion

The defendant's declaration that Paul Fugate died on January 13, 1980, was a decision it was authorized to make pursuant to the discretion it is statutorily granted by Congress. Since that determination was not arbitrary and capricious, and was based on the substantial evidence contained in the record before the agency, it must be honored by this Court. Any relationship between this determination and plaintiff's due process rights was incidental, and, as discussed above, her constitutional rights were not thwarted.

The termination of plaintiff's allotments by the NPS, upon its determination that Mr. Fugate was AWA, was mandated by the Missing Employees Act in order to prevent erroneous depletion of the federal treasury. Additionally, all allotments from an employee's pay are given at the discretion of the head of an agency, within the parameters of good faith. Plaintiff had no constitutionally-protected property rights regarding these allotments and their termination did not entitle her to a hearing. Accordingly, summary judgment must be granted in favor of the defendant regarding plaintiff's claim and the complaint must be dismissed.

The allotments paid to the plaintiff while her husband was in a "missing" status were paid due to a delay in receipt of evidence of Mr. Fugate's death by the agency. Therefore, the defendant's renewed motion regarding its counterclaim is denied.

Accordingly, the Clerk of the Court is directed to dismiss the plaintiff's complaint as well as the defendant's counterclaim. No costs.